# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 20, 2020

Lyle W. Cayce
Clerk

No. 19-30014

KATIE JOSEPH, *on behalf of* THE ESTATE OF KENDOLE JOSEPH, DECEASED; SHERESA JACKSON, *on behalf of her minor children*, K.B.J. and K.A.J.,

*Plaintiffs—Appellees*,

*versus*

DAMOND BARTLETT, *Officer*; EDDIE MARTIN, *Officer*; ARTHUR MORVANT, *Officer*; THOMAS THOMPSON, *Officer*; BRANDON LEDUFF, *Officer*; DUSTON COSTA, *Officer*; SHANNON DUGAS, *Officer*; JULIUS ROLLAND, *Officer*; STEVEN VERRETT, *Officer*; ROBERT FAISON, *Officer*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-5051

Before ELROD, WILLETT, and OLDHAM, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

"What is the virtue of a proportional response?" an exasperated President Bartlet demands in a memorable scene from the first season of The

No. 19-30014

West Wing.[1] Anything more, the Chairman of the Joint Chiefs of Staff coolly advises, would be a "staggering overreaction . . . you'll have doled out a $5,000 punishment for a fifty-buck crime."[2]

For those in positions of public trust—from Commanders in Chief (who must "take Care that the Laws be faithfully executed"[3]) to City of Gretna Police Officers (who "vow to protect life and property while safe guarding constitutional guarantees"[4])—proportional responses are good policy. We expect those charged with executing and enforcing our laws to take measured actions that ascend in severity only as circumstances require. A disproportionate response is unreasonable. And if it describes physical force inflicted by a police officer, it is unconstitutional.

That's the issue here: Did Gretna police officers respond "with measured and ascending actions that corresponded to" Kendole Joseph's behavior?[5] The Plaintiffs, Joseph's family, maintain that Joseph did not resist arrest, yet Officers Martin and Costa repeatedly tased and struck him, and nine other officers—Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett—did nothing to stop the abuse. The officers tell another story.

We must view the facts in the light most favorable to the nonmovants (here, Plaintiffs). Having done so, and based on the constitutional standard and the clearly established law, we conclude that Officers Martin and Costa

---

[1] *The West Wing*: *A Proportional Response* (NBC television broadcast Oct. 6, 1999).

[2] *Id.*

[3] U.S. Const. art. II, § 3.

[4] *Welcome Message from the Gretna PD*, Gretna Police Dep't, https://www.gretnapolice.com (last visited Nov. 20, 2020).

[5] *Pratt v. Harris Cty.*, 822 F.3d 174, 182 (5th Cir. 2016) (internal quotation omitted).

No. 19-30014

are not entitled to summary judgment. But on this record, the nine "bystander officers" are, given Plaintiffs' failure to make any arguments, and identify any cases, regarding clearly established law.

I

A

We begin with a 10,000-foot overview of the uncontroversial facts. A middle-school official saw Joseph near the school acting "strange" and asked school resource officers to check him out. When the school resource officers approached, Joseph ran into a nearby convenience store and jumped behind the checkout counter. The school resource officers followed and made radio calls, stating they were pursuing a "suspicious person." Twelve other officers joined them. About eight minutes after Joseph entered the store, the officers apprehended him and carried him to a police car, after which he became unresponsive and was taken to the hospital, where he died two days later.

The parties dispute what Joseph did and said during the eight-minute encounter in the store and what the officers saw, heard, and knew.

The evidence from surveillance video establishes when each officer entered the store and, to some degree, each officer's location and conduct in the store.[6] For the most part, Joseph cannot be seen in the video.

B

We now proceed through the facts in detail, including the disputed

---

[6] The relevant videos are here: http://www.ca5.uscourtsgov/opinions/pub/19/19-30014-chan3.mp4; http://www.ca5.uscourts.gov/opinions/pub/19/19-30014-chan4.mp4; https://www.ca5.uscourts.gov/opinions/pub/19/19-30014-chan6.mp4; https://www.ca5.uscourts.gov/opinions/pub/19/19-30014-TaserCamVideo.mp4; http://www.ca5.uscourts.gov/opinions/pub/19/19-30014-chan9.mp4.

facts, considering each officer's actions independently.[7] We draw these facts from the record, prioritizing the video evidence.[8] We view the facts and draw reasonable inferences in the light most favorable to Plaintiffs.[9] "In qualified immunity cases," which often involve competing versions of events, we take "the plaintiff's version of the facts," unless that version "is blatantly contradicted by the record, so that no reasonable jury could believe it."[10]

---

[7] *Darden v. City of Fort Worth* stated, "In cases where the defendants have not acted in unison, 'qualified immunity claims should be addressed separately for each individual defendant.'" 880 F.3d 722, 731 (5th Cir. 2018). To the extent that this could be read as suggesting that collective analysis is appropriate for defendants acting in unison, we don't read it that way. After all, *Darden* relies on authority explicitly stating that a district court erred by "consider[ing] the officers' actions collectively because it found they acted in unison." *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007). In any event, Plaintiffs do not argue that the officers acted in unison.

[8] *See Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016); *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).

[9] *Scott v. Harris*, 550 U.S. 372, 378 (2007)

[10] *Id.* at 378, 380; *accord Orr*, 844 F.3d at 490.

No. 19-30014

1

We begin with the events occurring before Joseph jumped behind the convenience-store counter. Around lunchtime on February 7, 2017, the assistant principal of Gretna Middle School noticed a "strange guy" standing outside the gate of the school and contacted Officer Thompson, a Gretna police officer assigned as the school resource officer. The "strange guy" was later identified as Kendole Joseph, a man with paranoid schizophrenia who had not taken his medication. The assistant principal described Joseph as "nervous and shaky" and reported that he "was staring," "not walking straight but rather weaving," talking to himself, saying "stuff she couldn't make out," shaking his leg, and biting his nails.

She asked Officer Thompson and Officer Morvant, another school resource officer, to check Joseph out. Officer Morvant approached Joseph and heard him yelling, "Help me from the police." Before Officer Morvant said anything, Joseph began running away from the school and pulling on the locked door handles of nearby cars, pleading for "help [] from the police." Officer Morvant found this behavior "odd" and "erratic" and knew that Joseph was possibly "emotionally disturbed." He radioed other officers in the area to report "a suspicious person who was fleeing."

Officers Martin and Leduff heard this radio transmission and spotted Joseph near a convenience store. They parked their marked police car, exited, and gave loud verbal commands for Joseph to come to them. Despite these commands, Joseph entered the store, and the officers followed him.[11] Officer Martin saw no weapon in Joseph's hands or any indication that he had one in

---

[11] For purposes of this appeal, Plaintiffs accept the district court's determination that Joseph disobeyed verbal commands from Officers Martin and Leduff before entering the store. We observe that this fact came from Officer Leduff's testimony.

No. 19-30014

his waistband, nor did he make any threatening moves like he was reaching for a weapon.

As Officer Martin entered the store, he trained his gun on Joseph, who was shouting, "Help me, help me somebody call the cops . . . . They're trying to kill me." When Officer Martin instructed Joseph to get on the ground, Joseph jumped over the checkout counter.[12]

2

The convenience-store manager, who was behind the counter at the time, testified that Joseph looked scared and immediately "went face down." Once on the ground, Joseph covered his face with his hands and assumed the fetal position. Seconds later, Officers Martin and Leduff followed Joseph over the counter. Officer Martin, weighing 300 pounds, immediately placed his full weight onto Joseph, who was still lying on the floor with his legs bent toward his chest. Officer Leduff began holding Joseph's upper body down. Officer Morvant entered the store next, briefly stopped to look over the counter, then walked behind the counter and began holding Joseph's lower body down. Officer Thompson then entered, followed by Officer Dugas, and both observed Joseph and the officers from the front side of the counter. At that point, approximately thirty seconds after Officer Martin jumped over the counter, he ordered Joseph to put his hands behind his back and deployed his taser for eleven seconds. Meanwhile, Officers Thompson and Dugas walked around the counter and continued observing from behind the counter. Officer Dugas handed a baton to Officer Martin, who jabbed it downward, striking Joseph at least twice with the pointed end.

---

[12] For purposes of this appeal, Plaintiffs accept the district court's determination that Joseph disobeyed the command to get on the ground. We observe that this fact came from Officer Martin's testimony.

No. 19-30014

A few seconds later, Officers Varisco, Costa, and Rolland entered the store, followed shortly by Officer Faison. Officers Varisco and Faison observed from the front side of the counter, and Officers Costa and Rolland walked behind the counter. Officer Varisco reached over to offer his taser to the officers behind the counter. Officer Costa briefly observed from behind the counter, then entered the scrum, holding Joseph's lower body down. At that point, Officer Morvant left the scrum and made his way to the front side of the counter, where he continued to observe. Officer Rolland continued to observe from behind the counter.

Officer Verrett then entered the store. Two seconds later, Officer Martin deployed his taser again, for three seconds. A few seconds later, Officer Bartlett entered the store and began to observe from the front side of the counter. Officers Faison and Verrett walked behind the counter and observed from there.

Officers Martin, Thompson, Dugas, and Costa began attempting to drag Joseph from the narrower area behind the counter to the wider area, on the path to the door.

Officer Costa then kicked Joseph twelve to thirteen times while holding onto the counter. During this time, Officer Verrett entered the scrum. Officer Martin then punched Joseph in the head three times. Officers Martin, Thompson, Dugas, Costa, Faison, and Verrett resumed their efforts to drag Joseph toward the wider area, while Officer Leduff observed. Once in the wider area, Officer Martin punched Joseph in the face three times. Officer Bartlett then jumped over the counter and began holding Joseph down. Seconds later, Officer Costa punched Joseph in the head six times.

Three-and-a-half minutes after Officer Costa's last strike, Officers Martin, Costa, and Verrett placed Joseph in handcuffs and leg shackles. Officers Martin, Verrett, Rolland, and Varisco carried him, face down, to

Officer Martin's patrol car. There, all officers except Officer Thompson placed Joseph feet-first in the car and pulled him "across the seat from the other side, bent his legs up, and shut the doors with [Joseph] in a prone position on the seat facedown." Joseph became unresponsive, at which point medical personnel, who had arrived on the scene before Joseph was carried out of the store, examined him for the first time. They performed CPR and took Joseph to the hospital, where he died from his injuries two days later.

3

In total, Joseph endured twenty-six blunt-force injuries to his face, chest, back, extremities, scrotum, and testes. Throughout the eight-minute encounter, Joseph was on the ground, experiencing acute psychosis, and continuously yelling. Officer Bartlett recalled Joseph "yelling random things" and pleading for someone to "call the police." Officer Faison and the store manager recalled him pleading for someone to "call the real police." Officer Leduff recalled Joseph calling for his mother and "saying all types of things," including that he was "about to be killed." The store manager recalled Joseph calling out for his mother and repeatedly yelling, "My name is Kendole Joseph," and "I do not have a weapon."

II

Joseph's family sued for violations of Joseph's Fourth Amendment rights, bringing excessive-force claims against Officers Martin and Costa and failure-to-intervene claims against Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett.[13] All officers moved for summary judgment, invoking qualified immunity.

---

[13] Not at issue in this appeal, Plaintiffs also brought state law claims and claims for unconstitutional deliberate indifference to medical needs.

No. 19-30014

The district court determined that genuine disputes of material fact exist as to whether Joseph actively resisted arrest during the encounter, and whether and when the officers became aware that Joseph was experiencing a mental-health crisis. Specifically, the parties dispute the points at which Joseph was on his stomach, back, and side. They also dispute the extent to which Joseph struggled against the officers, and the extent to which Joseph was physically able to comply with the officers' orders about putting his hands behind his back and rolling over. They dispute what the officers saw, heard, and knew—about Joseph's condition and about the actions of their fellow officers. And they dispute the cause of Joseph's death.

The district court concluded that, construing all facts and inferences in favor of Plaintiffs, the record supports the following account: Once behind the counter, Joseph immediately dropped into the fetal position, with his hands over his face. The officers then pinned him to the floor, rendering him incapable of complying with orders to put his hands behind his back and roll over. Joseph did not strike, kick, or threaten any officer, nor did he try. He squirmed, wiggled, and flailed at times, and he gave no struggle at other times. No officer attempted to negotiate with Joseph or otherwise de-escalate the encounter. No officer attempted to intervene, despite seeing and hearing Officers Martin and Costa tase, jab, punch, and kick Joseph, while he was pinned to the ground and experiencing a mental-health crisis. Joseph died from his injuries.

The district court concluded that the officers violated Joseph's Fourth Amendment rights in a manner prohibited by clearly established law, and that the officers were not entitled to qualified immunity. The court thus denied summary judgment.[14]

---

[14] *Joseph v. Doe*, No. 17-5051, 2019 WL 95467, at *16 (E.D. La. Jan. 3, 2019).

III

Our review involves multiple legal standards, corresponding to qualified immunity, summary judgment, interlocutory review of qualified immunity denials, and the Fourth Amendment. The intersection of these standards gets tricky, so we address each in turn, starting with qualified immunity.

As a theoretical backdrop, the doctrine of qualified immunity attempts to balance two competing societal interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[15] These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[16]

In practice, applying that standard involves significant departures from the norms of civil litigation—particularly summary-judgment norms.[17] Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.

A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right—that is, the plaintiff must make this showing whether or not qualified immunity is

---

[15] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[16] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[17] *See generally* Alan K. Chen, *The Burdens of Qualified Immunity: Summary Judgment and the Role of Facts in Constitutional Tort Law*, 47 Am. U. L. Rev. 1 (1997) (discussing theoretical and practical problems with synthesizing qualified immunity and summary judgment).

involved.[18] But when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was "clearly established" at the time of the alleged violation.[19]

This expanded substantive burden isn't the only special feature of qualified immunity. Burden shifting changes, too. Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial.[21] For a defendant, this means showing that the record cannot support a win for the plaintiff—either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim.[22] The defendant can show this by

---

[18] At the pleading stage, the plaintiff must allege facts that demonstrate unlawful conduct; at the judgment stage, the plaintiff must show proof of such facts. *Pearson*, 555 U.S. at 232 (distinguishing the plaintiff's burden under Rules 12(b)(6) and (c) versus Rules 50 and 56).

[19] *See Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

The First, Second, Third, Fourth, Ninth, and D.C. Circuits place the burden on the defendant, while the Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits place it on the plaintiff. Kenneth Duvall, *Burdens of Proof and Qualified Immunity*, 37 S. Ill. U. L.J. 135, 145 (2012). In the Fourth Circuit, the defendant has the burden to show that the law was clearly established, and the plaintiff has the burden to show violation of a constitutional right. *Id.* In the Eighth Circuit, the opposite rule applies. *Id.*

[20] Fed. R. Civ. P. 56(a).

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[22] *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) ("[I]f the movant bears the burden of proof on an issue because as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the defense to warrant judgment in his favor." (alterations omitted) (quotation omitted)).

introducing undisputed evidence or by "pointing out . . . an absence of evidence to support the [plaintiff's] case."[23] If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there *is* a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.[24]

But that changes with qualified immunity. When a public official makes "a good-faith assertion of qualified immunity," that "alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."[25] In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.[26]

Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to "identify a case"—usually, a "body of relevant case law"—in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution]."[27] While

---

[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 325 (1986).

[24] *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020).

[25] *Orr*, 844 F.3d at 490.

[26] *King v. Handorf*, 821 F.3d 650, 653–54 (5th Cir. 2016).

[27] *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (first quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015), then quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

there need not be "a case directly on point," the unlawfulness of the challenged conduct must be "beyond debate."[28] This leaves the "rare" possibility that, in an "obvious case," analogous case law "is not needed" because "the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances."[29]

Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by "view[ing] the facts in the light most favorable to the nonmoving party and draw[ing] all reasonable inferences in its favor" (so far normal), then determining whether the plaintiff can prove a constitutional violation (still normal) that was clearly established (not normal).[30]

Things change for appellate courts, too—we review earlier than we otherwise would, and we review less than we otherwise would. An official who unsuccessfully moves for summary judgment on qualified-immunity grounds may immediately appeal the denial of qualified immunity, which would otherwise not be final and appealable.[31] An official can take multiple immediate appeals because the official can raise qualified immunity at any stage in the litigation—from Rule 12(b)(6) motions to dismiss, to Rule 12(c) motions for judgment on the pleadings, to Rule 56 motions for summary

---

[28] *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

[29] *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

[30] *Deville v. Marcantel*, 567 F.3d 156, 164 (2009) (per curiam); *see also Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (instructing courts to rely on the plaintiff's version of the facts when evaluating clearly established law).

[31] *Mitchell v. Forsyth*, 472 U.S. 511, 526, 530 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

judgment, to Rule 50(b) post-verdict motions for judgment as a matter of law—and continue to raise it at each successive stage.[32]

Our review is de novo, as summary-judgment review usually is.[33] But we only review a denial of summary judgment based on qualified immunity "to the extent that it turns on an issue of law."[34] Both steps—the constitutional merits and the "clearly established law" inquiry—are questions of law. That means we do not second-guess the district court's determination that there are genuine disputes of material fact, as we otherwise might.[35] When the district court identifies a factual dispute, as it did here, we consider only whether the district court correctly assessed "the legal significance" of the facts it "deemed sufficiently supported for purposes of summary judgment."[36] But we do not evaluate whether the district court correctly deemed the facts to be "sufficiently supported"; that is, whether the "evidence in the record" would permit "a jury to conclude that certain facts are true."[37] In short, we may evaluate whether a factual dispute is *material* (i.e., legally significant), but we may not evaluate whether it is *genuine* (i.e., exists).[38]

---

[32] *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *Carroll v. Ellington*, 800 F.3d 154, 167 (5th Cir. 2015).

[33] *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

[34] *Mitchell*, 472 U.S. at 530; *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc); *King*, 821 F.3d at 653; *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013).

[35] *E.g.*, *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019) (holding that there was a genuine issue of fact after evaluating the plaintiff's evidence).

[36] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc) ("We lack jurisdiction to resolve the genuineness of any factual disputes . . . ." (quoting *Lytle v. Bexar Cty.*, 560 F.3d 404, 408 (5th Cir. 2009))).

[37] *Id.*

[38] *Melton*, 875 F.3d at 261.

No. 19-30014

## IV

While we have discretion to leapfrog the merits and go straight to whether the alleged violation offended clearly established law,[39] we think it better to address both steps in order to provide clarity and guidance for officers and courts.[40] We consider first the excessive-force claims against Officers Martin and Costa. We then address the claims against Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett.

---

[39] *See Pearson*, 555 U.S. at 236; *Mullenix*, 136 S. Ct. at 308.

[40] For years, our court has found value in addressing the constitutional merits to develop robust case law on the scope of constitutional rights. For instance, shortly after *Pearson* was decided, our en banc court chose to address the First Amendment merits even though a majority of the court concluded that the defendants had not violated clearly established law. *See Morgan*, 659 F.3d at 395 (Elrod, J., writing for the majority in part and dissenting in part) (holding, for the majority, that discriminating against student speech on the basis of religious viewpoint violated the First Amendment and concluding, in dissent, that the right was clearly established). We have found the merits analysis particularly appropriate in Fourth Amendment cases, which frequently involve qualified immunity. *See Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (addressing the merits for the benefit of "developing constitutional precedent" in Fourth Amendment law, "an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense")). The big-picture takeaway:

> Forgoing a knotty constitutional inquiry makes for easier sledding, no doubt. But the inexorable result is "constitutional stagnation"—fewer courts establishing law at all, much less clearly doing so. Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.

*Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) (footnote omitted).

No. 19-30014

## A

### 1

The constitutional provision governing the claims against Officers Martin and Costa is the Fourth Amendment, which protects the right to be free from excessive force during a seizure.[41] A violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force.[42] Determining whether force was excessive or unreasonable is a "necessarily fact-intensive" and case-specific inquiry.[43] The test for reasonableness is "not capable of precise definition or mechanical application."[44] But in *Graham v. Connor*, the Supreme Court outlined a few considerations that inform the need for force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.[45] We review these considerations "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[46]

---

[41] *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

[42] *Id.* at 628. The Fourth Amendment's "objectively unreasonable" analysis does not collapse with clearly established law's reasonableness inquiry, such that one reasonableness inquiry covers both bases. *Saucier v. Katz*, 533 U.S. 194, 205–06 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236. Reasonableness plays two distinct roles, informing the Fourth Amendment merits (was the use of force reasonable?) and the clearly established law (was the officer's understanding of his authority to use force reasonable?). *Id.*

[43] *Poole*, 691 F.3d at 628 (quotation omitted).

[44] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[45] *Id.*; *see also Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

[46] *Graham*, 490 U.S. at 396.

And we "must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'"[47] The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive.[48] While "a suspect's refusal to comply with instructions" may indicate that physical force is justified, officers must also select the appropriate "*degree* of force."[49] To stay within constitutional bounds, an officer must use force "with measured and ascending actions that correspond[] to [a suspect's] escalating verbal and physical resistance."[50] Therefore, force may be less justified or unjustified when a suspect engages in "passive resistance," as opposed to "active resistance."[51] As to a passively resisting suspect, an officer does not take measured and ascending action by "immediately resort[ing] to taser and nightstick without attempting to use physical skill, negotiation, or even commands."[52]

---

[47] *Deville*, 567 F.3d at 167 (quotation omitted).

[48] *See id.*; *accord Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) ("A suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test."). *See also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (quoting *Lytle*, 560 F.3d at 413)).

[49] *Deville*, 567 F.3d at 167–68.

[50] *Poole*, 691 F.3d at 629 (quotation omitted).

[51] *See Deville*, 567 F.3d at 167 (concluding that officers unreasonably broke the driver's side window to extract a driver whose "resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child"). *Compare Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (stating that "force is not justified" for passive resistance), *with Hanks v. Rogers*, 853 F.3d 738, 743, 746 (5th Cir. 2017) (concluding that "a blow to [the suspect's] upper back or neck" was unreasonable when the suspect resisted only passively by not immediately obeying the officer's order to kneel).

[52] *Newman*, 703 F.3d at 763; *accord Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016) ("[W]e have placed weight on the quickness with which law enforcement personnel have

No. 19-30014

Here, the district court treated the excessive-force claims as brought against only Officers Martin and Costa. The court determined that the parties had agreed that only Officers Martin and Costa—and not the "bystander officers," Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett—had exerted constitutionally relevant force against Joseph. The court then analyzed each *Graham* factor. The first factor (the severity of the crime) weighed heavily in Joseph's favor, the court concluded, because "it is undisputed that [Joseph] had not committed and was not committing any crime." Specifically, the court recounted that the radio transmission by Officer Morvant, which Officers Martin and Costa both testified they heard, contained no indication that Joseph was suspected of criminal activity, was armed, or posed a threat to himself or others.[53]

For the second factor (whether the suspect posed an immediate threat) the court determined that, in the light most favorable to Plaintiffs, Joseph presented "no immediate threat to the safety of the officers or others." Specifically, Officers Martin and Costa knew Joseph was experiencing a mental-health crisis because they could perceive that he was scared and they could hear him yelling unusual, irrational statements, like asking for his mother and for somebody to call the real police. Officers Martin and Costa knew Joseph was unarmed because he yelled that, too; plus, no officer observed a weapon or an indication of a weapon. Officers Martin and Costa saw Joseph on the floor, having "assumed a fetal, or defensive, position" and knew he presented no threat to the store manager behind the

---

escalated from negotiation to force." (citing *Newman*, 703 F.3d at 763; *Deville*, 567 F.3d at 167–68)).

[53] Officer Leduff, who heard the radio transmission, recalled Officer Morvant stating that the school official had reported "a subject," "coming on and off the property" and that the subject "took off" down the street after Officer Morvant "tried to talk to the guy."

counter. The court found this version of the facts consistent with the video evidence. So, the second factor weighed in Joseph's favor, as Plaintiffs' version of the facts showed that Joseph presented no more of a threat than the inherent threat posed by "virtually all arrestees."[54]

For the third factor (whether the suspect was actively resisting or evading arrest) the court concluded that, construing the facts and inferences in favor of Plaintiffs, Joseph did not try to flee and did not resist arrest, at least not actively. Specifically, although Joseph may have disobeyed officer commands by entering the store, Joseph did not attempt to leave the store. Rather, he immediately dropped onto the floor in the fetal position. Joseph did not attempt to strike any officer; he flailed his legs and wiggled his body but made no contact with any officer. This version of the facts, the district court ascertained, was consistent with the video evidence. What is more, the district court observed, the video suggested that Joseph was not struggling against the officers at all "[f]or substantial portions" of the encounter.

Evaluating the relationship between the need for force and the amount of force used, the court determined that Officers Martin and Costa failed to employ measured and ascending action by "immediately resort[ing] to force, without any attempt to de-escalate the volatile situation" or "negotiate," "despite their knowledge that [Joseph] was mentally disturbed." The court further determined that the degree of force was excessive because Officers Martin and Costa "pin[ned] him to the floor"; Officer Martin "tased him twice, beat him with a baton," and "punched him in the head"; and Officer Costa punched him and "kicked him in the groin and elsewhere on the body." The district court concluded that on Plaintiffs' version of the facts, Officers Martin and Costa had violated Joseph's Fourth Amendment rights

---

[54] *See Poole*, 691 F.3d at 639 (Elrod, J., concurring in part and dissenting in part).

by applying excessive force. The district court then denied summary judgment as to all officers.

On appeal, the officers argue first that the district court inappropriately relied on the complaint rather than on the evidence. A court may not rely on mere factual allegations in an unverified complaint to make summary-judgment rulings.[55] But the district court here relied on the parties' statements of material facts and video footage, and the court's record citations reflect that it also relied on depositions, exhibits, and other materials expressly allowed under Federal Rule of Civil Procedure 56(b)(1). The officers attempt to rebut the facts and inferences favorable to Plaintiffs with their own testimony, but that does not entitle them to summary judgment.

Second, the officers argue that it is immaterial whether Joseph attempted to strike or kick an officer, resisted only passively, or was experiencing mental-health problems. They argue that they took measured and ascending actions corresponding to the threat that Joseph posed by fleeing, ignoring their commands, and struggling against them, while the store manager was nearby. To be sure, the legal significance of an officer's awareness of a suspect's mental health is murky.[56] We need not enter that

---

[55] FED. R. CIV. P. 56(c).

[56] In 2015, the Supreme Court found that clearly established law as of 2008 did not require officers to accommodate a suspect's mental illness: "If anything, the opposite may be true." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775, 1778 (2015) (first citing *Bates v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public."), then citing *Sanders v. Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) (same), and then citing *Menuel v. Atlanta*, 25 F.3d 990 (11th Cir. 1994) (upholding use of deadly force to try to apprehend a mentally ill man who had a knife and was hiding behind a door)).

Not long ago, in *Cole*, we took "no position on the public policy issues of the day regarding policing and the mentally ill." 935 F.3d at 457 (5th Cir. 2019) (Elrod, J., concurring). *But see id.* at 468 (Jones, J., dissenting) (evaluating the suspect's mental

No. 19-30014

thicket today, however, for two reasons. First, the parties did not cite any authority here or in the district court to explain how Joseph's mental health affects the legal analysis. We will not decide the issue in the first instance without the benefit of briefing or the district court's analysis.

Second, resolving the issue would not change our conclusion in this case. If Joseph was not actively resisting, Officers Martin and Costa inflicted force beyond what the Fourth Amendment permits, regardless of whether they also knew about Joseph's mental-health status. The district court found that genuine factual disputes exist as to whether, how, and when Joseph resisted or was subdued. We cannot second-guess the existence of those factual disputes. The video does not discredit Plaintiffs' view of the facts: Officer Martin saw Joseph jumping over the counter at a spot past the clerk's location, immediately taking the fetal position, and giving no resistance other than flailing his arms and legs; and, having entered the store later, Officer Costa saw Joseph maintain that state. And the officers cite no authority to support their contention that disputed facts demonstrating a suspect's

---

distress among other threats to officer safety); *id.* at 475–76 (Ho & Oldham, JJ., dissenting) (similar).

The Tenth Circuit considers mental illness within the third *Graham* factor, as to resistance. *See Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) ("It is not reasonable for an officer to repeatedly use a taser against a subdued arrestee they know to be mentally ill, whose crime is minor, and who poses no threat to the officers or others.").

The Ninth Circuit says it diminishes the government's interest in using force, making force less reasonable. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018); *accord Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010).

The Fourth and Sixth Circuits say that "officers who encounter an unarmed and minimally threatening individual who is 'exhibiting conspicuous signs that he is mentally unstable' must 'de-escalate the situation and adjust the application of force downward.'" *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (alterations omitted) (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013)).

resistance are legally irrelevant—indeed, the cases uniformly treat a suspect's resistance as material.[57]

Force must be reduced once a suspect has been subdued.[58] Notably, "subdued" does not mean "handcuffed." If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified.[59] So even if Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely.

And summary judgment is inappropriate when the timing of the officer's force may or may not have corresponded to the timing of the suspect's resistance. For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, active resistance. In *Curran*, the district court determined that the suspect had in fact "battered" the officer before the officer "slammed" Curran's head into a wall.[60] However, because the district court concluded that there was a fact dispute over how much time passed between the suspect's actions and the officer's use of force, we declined to grant summary judgment for the officer.[61] As we recognized in that case, if enough time had lapsed that it was

---

[57] *E.g.*, *Deville*, 567 F.3d at 167; *Poole*, 691 F.3d at 629; *Newman*, 703 F.3d at 763.

[58] *See, e.g.*, *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *Carroll*, 800 F.3d at 178.

[59] *See Cooper*, 844 F.3d at 524 (finding excessive force when officer did not release his police dog's bite until after handcuffing the suspect because the suspect was unarmed, in a trash bin, and physically unable to evade custody); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding that tasing was excessive force when a suspect pulled his arm away before the officer had finished handcuffing him).

[60] 800 F.3d at 660–61.

[61] *Id.* at 663.

obvious that the suspect was no longer resisting, the officer's force could not have been reasonable.[62] The timing and amount of resistance are "key."[63]

The remainder of the officers' brief essentially asks us to reconsider the district court's factual determinations, which we may not do.[64]

Viewing the facts in the light most favorable to Plaintiffs, we agree with the district court's weighing of factors. We hold that, if a jury found those facts to be true, Officers Martin and Costa violated Joseph's right to be free from excessive force during a seizure by failing to employ a measured and ascending response to the threat Joseph posed. Though Joseph was not suspected of committing any crime,[65] was in the fetal position, and was not actively resisting, Officers Martin and Costa inflicted twenty-six blunt-force injuries on Joseph and tased him twice, all while he pleaded for help and reiterated that he was not armed. Officers Martin and Costa are not entitled to summary judgment on the constitutional merits.

Here, Plaintiffs may not be able to prove their claims, and the officers may well prevail at trial. But our task at this stage is to ascertain whether, viewing all facts and drawing all reasonable inferences in Plaintiffs' favor, there exist genuine disputes of material fact that a jury should suss out. Based on the record before us and our standard of review at this stage, there are genuine disputes of material fact, meaning that Plaintiffs are entitled to make

---

[62] *Id.* at 661; *accord Mason*, 806 F.3d at 277.

[63] *Curran*, 800 F.3d at 661.

[64] *See Melton*, 875 F.3d at 261.

[65] Plaintiffs argue that any resistance Joseph exhibited was lawful because he was resisting an unlawful arrest. The district court did not address this argument. We decline to address it in the first instance because, whether or not Joseph had a legal justification for resisting, on Plaintiffs' version of the facts, his resistance was at most passive.

their best case to a jury. If, that is, they can also demonstrate these facts amount to a violation of clearly established law, which we confront next.

2

On Plaintiffs' facts, Officers Martin and Costa violated Joseph's Fourth Amendment rights. But that does not defeat qualified immunity. Plaintiffs must also demonstrate that the law was "clearly established"—that, as of February 7, 2017, the date of their encounter with Joseph, any reasonable officer would have known that Officer Martin's and Officer Costa's behavior was unlawful.[66]

Decades ago, *Graham* clearly established that the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.[67] But aside from "rare," "obvious" cases, the allegedly violated right cannot be defined at this level of generality to overcome a qualified-immunity defense. In theory, "[i]t could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police."[68] So instead, to protect the desired balance at which the qualified-immunity doctrine aims, "the right allegedly violated must be defined at the appropriate level of specificity."[69]

The Supreme Court has explained that for a court to deny qualified immunity based on "clearly established" law, "existing precedent must have

---

[66] *Saucier*, 533 U.S. at 199.

[67] *Id.* at 201–02.

[68] *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

[69] *Id.*

placed the statutory or constitutional question beyond debate."[70] In other words, existing precedent must "squarely govern[]" the specific facts at issue, such that only someone who is "plainly incompetent" or who "knowingly violates the law" would have behaved as the official did.[71] Because this "specificity" "is 'especially important in the Fourth Amendment context,'" the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'"[72]

In this case, the district court found that a genuine dispute exists such that, under Plaintiffs' version of the facts, Officers Martin and Costa used force in a manner that violated clearly established law. The district court undertook the clearly established law analysis itself, as Plaintiffs had twice failed to identify a case putting the officers on notice that their conduct was unconstitutional. The court had ordered supplemental briefing specifically identifying this failure, giving Plaintiffs a second chance. Plaintiffs urged that this was an obvious case, but the court did not adopt that reasoning.

The officers ask us to reverse on grounds of clearly established law, again arguing that the officers' actions were justified because Joseph was struggling and noncompliant. We have no more ability to review these factual disputes as to clearly established law than we did as to the constitutional merits—which is to say, none.

The officers also ask us to reverse because the district court did not hold Plaintiffs to their burden to identify an analogous case, and this is not

---

[70] *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).

[71] *Mullenix*, 136 S. Ct. at 310 (quotation and alterations omitted).

[72] *Wesby*, 138 S. Ct. at 590 (first quoting *Mullenix*, 136 S. Ct. at 308, then quoting *White*, 137 S. Ct. at 552).

the rare obvious case for which no similar case is needed. Plaintiffs now argue that *Newman*, *Deville*, and *Darden* clearly established that "two taser strikes, baton strikes, punches to the head, and kicks to the groin and elsewhere" was excessive force because Joseph "engaged in no violence, committed no crime, caused no harm, surrendered into the fetal position behind a store counter, and . . . at all times presented with psychological disorientation."

The standard for obviousness is sky high, and this case does not meet it. We have nothing approaching the clarity we have perceived in other obvious cases. For example, we found that it was obviously unconstitutional for an officer to shoot—without warning, despite an opportunity to warn—a suspect who was pointing a gun to his own head and did not know the officer was there.[73] We explained that it was an obvious case because *Tennessee v. Garner* prohibits the use of deadly force without an immediate threat and without a warning when one is feasible.[74]

In another case, we found that an officer obviously did not have reasonable suspicion to detain a man based on the following: The man briefly looked around a car in a well-lit parking lot, turned to get into another car, noticed the officer, got into that other car, and began to drive.[75] The man exhibited no headlong flight or evasive behavior, and the officer had no prior tip or other information providing a reason to suspect the man of criminal activity.[76]

---

[73] *Cole*, 935 F.3d at 453. Though, for what it's worth, that case was not obvious to the seven (of eighteen) members of our en banc court who wrote and joined the *five* dissenting opinions.

[74] *Id.*

[75] *Alexander v. City of Round Rock*, 854 F.3d 298, 305 (5th Cir. 2017).

[76] *Id.*

No. 19-30014

Here, the parties agree that the officers became involved because the assistant middle-school principal expressed concerns about Joseph being near the school. The parties agree that Joseph ran from the officers and disobeyed commands. The parties dispute how, if, and when Joseph resisted during the encounter in the store. The district court declined to find this case was obvious, and we are not persuaded otherwise.

Therefore, we must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'"[77] While we needn't limit our analysis to the cases cited by Plaintiffs,[78] we must explain why the cases we identify prohibited the challenged conduct in this case.[79]

Surveying the state of the law as of February 7, 2017, we conclude that analogous facts from *Newman v. Guedry*, *Ramirez v. Martinez*, and *Cooper v. Brown* provided notice to any reasonable officer that it was unconstitutional to tase and strike Joseph as Officers Martin and Costa did here.

In *Newman*, we held that officers violated the Fourth Amendment by repeatedly striking and tasing an individual who "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command."[80] There, officers had pulled over a car for a minor traffic

---

[77] *Wesby*, 138 S. Ct. at 590 (quoting *White*, 137 S. Ct. at 552).

[78] Inadequate briefing can cause parties to forfeit claims and arguments, but we must apply settled case law. *See Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("A court engaging in review of a qualified immunity judgment should [] use its full knowledge of its own and other relevant precedents." (internal quotation and alteration omitted)).

[79] The Supreme Court recently reversed a denial of qualified immunity because the court "made no effort to explain how that case law prohibited [the defendant's] actions in this case." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503–04 (2019). As the Court put it, "That is a problem under our precedents."

[80] 703 F.3d at 764.

violation and asked the driver to step out of the car.[81] As the officers attempted to handcuff the driver based on an outstanding warrant, Newman—a passenger, suspected of no wrongdoing himself—stepped out of the car. Although he did not follow the officers' instructions to stay in the car, he turned his body toward the car, placed his hands flat on the roof of the car, and urged the driver to "chill out," all the while his hands raised and palms open.[82] Backup officers arrived, instructed Newman to move to the rear of the car, and conducted a protective pat-down search.[83] Newman claimed that during the pat down, the officer's hand lingered on his crotch for "an uncomfortable length of time," prompting Newman to make an off-color remark.[84] The officer pushed Newman forward onto the car and another officer came over to assist, pushing Newman further onto the car and striking him with his baton.[85] When Newman stepped back after the blow, one officer struck him repeatedly on the arm and thigh with a baton and the other officer tased him three times.[86]

The officers claimed that their behavior was objectively reasonable because Newman had resisted search and arrest, had struggled, had been noncompliant, and had reached for his waistband.[87] But Newman's evidence contradicted all of this, and the video evidence did not prove or disprove either party's version of the facts. And we noted that, even if Newman

---

[81] *Id.* at 759.

[82] *Id.*

[83] *Id.* at 759–60.

[84] *Id.* at 760.

[85] *Id.*

[86] *Id.*

[87] *Id.* at 762.

"struggle[d]" by pushing himself off from the car and back into the officers, after being struck ten times, this type of "struggle" "did not rise to the level of 'active resistance.' "[88] We further explained that "the officers immediately resorted to taser and nightstick without attempting to use physical skill, negotiation, or even commands."[89] Therefore, we held, the officers responded disproportionately to the threat and applied excessive force in violation of the Fourth Amendment.

Here, as in *Newman*, Joseph was not suspected of committing a crime. He was not armed. Even if he disobeyed officer commands, on Plaintiffs' version of the facts he offered no active resistance. And, according to Plaintiffs, Officer Martin immediately resorted to physical force, including use of a taser and a baton, and he and Officer Costa resorted to punches and kicks without attempting negotiation.

In *Ramirez v. Martinez*, construing the disputed facts in the plaintiff's favor, we found that officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back, and pulling his arm away when an officer grabbed his hand.[90] We concluded that he posed so little threat that tasing him before he was handcuffed was excessive; tasing him after he was "handcuffed and subdued while lying face down on the ground" was even more so.[91]

In this case, Plaintiffs' view of the facts shows that Joseph resisted, at most, passively, by disobeying similar orders and pulling away from the

---

[88] *Id.* at 763.

[89] *Id.*

[90] 716 F.3d at 378.

[91] *Id.* at 379.

officers. Plus, the district court concluded that, at points, he was not resisting at all, meaning that, at points, he was subdued and *no* force was justified. Yet, Officer Martin immediately applied significant physical force by pinning him down, tasing him, and jabbing him with a baton, and Officers Martin and Costa continued applying force by punching and kicking him, even while he was subdued and not resisting. While the officers maintain that Joseph was resisting, the video does not preclude the possibility that he wasn't. Construing all facts and inferences in the light most favorable to Plaintiffs, Joseph remained on the ground, in the fetal position, resisting intermittently and passively, if at all.

And in *Cooper v. Brown*, we concluded that an officer inflicted excessive force by declining to release his police dog's bite until after he had handcuffed the suspect.[92] True, the force in this case was non-canine. But as we have explained, the "[l]awfulness of force . . . does not depend on the precise instrument used to apply it."[93] The pertinent fact in *Cooper* is that the officer encountered the suspect cornered, in a small "cubbyhole" for storing trash bins. This location, combined with the dog physically keeping him from going anywhere, left the suspect with no meaningful way to evade police custody.[94]

Similarly, here, Joseph was cornered behind the counter and would have had to get past as many as a dozen police officers in order to leave the store. As in *Cooper*, Joseph was unarmed and the officers had no indication that he was. Yet, viewing the evidence in the light most favorable to Plaintiffs,

---

[92] 844 F.3d at 526.

[93] *Newman*, 703 F.3d at 763.

[94] *Cooper*, 844 F.3d at 526 (citing *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012)).

Officers Martin and Costa "increased the force applied at the same time the threat presented by [the suspect] decreased" by the presence of additional officers in the store and Joseph's waning resistance.[95]

*Pratt v. Harris County* provides a helpful counterexample.[96] In *Pratt*, officers came upon a car in a ditch and observed the suspect, Pratt, "running in circles, imitating a boxer."[97] Pratt then began approaching the officers, coming within five to seven feet of them. The officers' initial response to the threat of an approaching suspect was unholstering their tasers and instructing Pratt to stop. Instead of stopping, Pratt ran away. So, as an escalated response to escalated resistance, one officer deployed his taser. But Pratt kept running. Because Pratt was still resisting, the officer deployed his taser two more times, to no avail. Pratt kept running. So another officer deployed his taser, this time successfully ending Pratt's flight but not his resistance.

Pratt struggled against the officers who attempted to handcuff him, such that they could only secure one of his arms in the cuffs. So Pratt was tased again. Eventually, Pratt claimed, "okay, okay, I'll quit. . . . I'll stop fighting."[98] Officers then successfully handcuffed Pratt and began walking him toward the patrol car. A few steps into the journey, Pratt reignited his resistance and broke free of the officer's grip. Another officer "returned Pratt to the ground," where Pratt began kicking the officers—one officer was struck twice in the groin.[99] In response to Pratt's escalating resistance, the officers handcuffed his ankles. Still, the officers were not able to control him,

---

[95] *Id.* at 525 (quoting *Edwards v. Shanley*, 666 F.3d 1289, 1296 (11th Cir. 2012)).

[96] 822 F.3d 174 (5th Cir. 2016).

[97] *Id.* at 178 (alteration omitted).

[98] *Id.*

[99] *Id.*

so they tased Pratt once more. This time, the taser's leads directly contacted Pratt's body, and the officers were able to get control of Pratt's legs and roll him onto his stomach. One officer also placed his knee on Pratt's back to keep him under control, at which point Pratt responded, "Ok[ay] I quit. I'm done."[100] Pratt was then hog-tied (with Pratt still on his stomach, the handcuffs around his wrists were connected to the handcuffs around his ankles) until EMS arrived.[101]

We concluded that the officers' actions did not amount to excessive force because "the officers responded with measured and ascending actions that corresponded to Pratt's escalating verbal and physical resistance."[102] For instance, we highlighted that the officers did not deploy their tasers "as the *first method* to gain Pratt's compliance."[103] Each escalating use of force was in direct response to Pratt's escalating resistance. The officers asked Pratt to comply and warned him multiple times, which Pratt ignored. Under these circumstances, the officers' force was constitutional.[104]

---

[100] *Id.*

[101] *Id.* at 178–79. Tragically, Pratt died the next day. His autopsy concluded that the cause of death was "best classified as 'UNDETERMINED'" as the effect of Pratt's ingestion of cocaine and ethanol could not be "definitively separate[d]" from the other possible contributing factors, such as Pratt's car accident, altercations, tasing, and hog-tying. *Id.* at 179.

[102] *Id.* at 182 (internal quotation and alteration omitted).

[103] *Id.*

[104] *Id.* at 184. Similarly, in *Williams v. City of Cleveland*, officers offered *repeated* warnings to the suspect that he would be tased if he continued resisting arrest. 736 F.3d 684 (5th Cir. 2013) (per curiam). The suspect continued resisting, and he was tased. The suspect continued to resist, and even reached for one officer's taser, so he was tased again. *Id.* at 686. The officers warned. The suspect disobeyed. *Only then* did the officers use force. The suspect increased his resistance. And *only then* did the officers use more force. A proportionate, constitutional response.

No. 19-30014

The stark contrast between the facts of *Pratt* and this case emphasize that the behavior of Officers Martin and Costa was clearly unconstitutional. On Plaintiffs' facts, as Joseph lay on the floor behind the convenience-store counter in the fetal position, repeatedly asking for help and exclaiming that he was not armed, Officer Martin did not request compliance or warn Joseph before tasing him, using his baton on him, or punching him. Officer Costa did not command or warn Joseph before kicking or punching him. Officers Martin and Costa did not reserve their tasings, punches, and kicks as responses to active resistance. They put force first. The evidence here permits a finding that—unlike the proportionately responding officers in *Pratt* and, instead, like the disproportionately responding officers in *Newman*, *Ramirez*, and *Cooper*—Officers Martin and Costa violated clearly established law by failing to attempt less forceful alternatives and by continuing to inflict force despite Joseph committing no crime, posing no threat, and giving no active resistance.

As the district court did, we find further confirmation that we have correctly ascertained the clearly established law as of February 7, 2017, because a number of our opinions released after February 7, 2017, conclude that these principles were the clearly established law by 2013.[105]

---

[105] The district court also discussed *Hanks*, a case that described the clearly established law as of February 26, 2013. 853 F.3d at 747–49 (citing *Deville*, 567 F.3d at 168; *Poole*, 691 F.3d at 631). Same for *Trammell*, which described clearly established law as of January 21, 2013. 868 F.3d at 341–43 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 733–34, 740 (5th Cir. 2000); *Newman*, 703 F.3d at 763; *Deville*, 567 F.3d at 168; *Poole*, 691 F.3d at 629).

The district court also considered some of our unpublished opinions, which cannot clearly establish the law but can illustrate or "guide us to such authority," by "restating what was clearly established in precedents they cite or elsewhere." *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019); *see also Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018). The court reviewed *Doss v. Helpenstell*, 626 F. App'x 453 (5th Cir. 2015), *Keele v.*

We encountered a scenario like this in *Darden v. City of Fort Worth*, requiring us to describe the law that was clearly established as of May 16, 2013.[106] There, while executing a search warrant, one officer threw to the ground and twice tased a suspect who was not resisting arrest.[107] And another officer kicked, punched, and choked the suspect, and then forced him into a prone position.[108] We held that, viewing the facts in Darden's favor, both officers violated clearly established law because any reasonable officer would know that "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."[109] As the district court did in this case, we observed in *Darden* that a jury could ultimately determine that the suspect was in fact resisting arrest or disobeying commands.[110] And under those alternative facts, the officers' force may have been reasonable under the Fourth Amendment and reasonable under the clearly established law.[111] Yet, a genuine dispute of material fact existed, meaning that a jury could also find facts demonstrating the opposite. Therefore, the officers were not entitled to qualified immunity at the summary-judgment stage.[112]

---

*Leyva*, 69 F. App'x 659 (5th Cir. 2003), and *Galvan v. City of San Antonio*, 435 F. App'x 309 (5th Cir. 2010).

[106] 880 F.3d at 731 (citing *Ramirez*, 716 F.3d at 377–78; *Newman*, 703 F.3d at 762–63; *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)).

[107] *Id.*

[108] *Id.* at 732.

[109] *Id.* at 731 (citing *Ramirez*, 716 F.3d at 377–78; *Newman*, 703 F.3d at 762–63; and *Bush*, 513 F.3d at 501).

[110] *Id.* at 732.

[111] *See id.* at 731.

[112] *Id.* at 731–32.

*Darden* announced no new rule; it reaffirmed an already-existing one. *Darden* repeated what had long been established in our circuit: Officers engage in excessive force when they physically strike a suspect who is not resisting arrest. For us to say that the unlawfulness of such conduct wasn't clearly established in 2017, despite the fact that *Darden* said it was clearly established in 2013, would flout precedent and our rule of orderliness.[113]

In sum, viewing the facts in Plaintiffs' favor, Officer Martin struck, punched, and tased Joseph, while Officer Costa repeatedly kicked and punched him—twenty-six blunt-force strikes and two rounds of tasing in total. All the while, Joseph was facedown in the fetal position, not suspected of committing any crime, not posing a threat to officers or others, and not actively resisting arrest. Officers Martin and Costa did not respond to Joseph with measured and ascending force that corresponded to his resistance. If Plaintiffs' facts are true, the actions of Officers Martin and Costa were disproportionate to the situation, in violation of the Fourth Amendment and the clearly established law. And thus, Officers Martin and Costa are not entitled to qualified immunity at this stage.

## B

### 1

Officers Costa and Martin were not the only officers at the scene. Roughly a dozen police officials stood around and behind the checkout counter observing the use of force against Joseph, and not one attempted to stop Officers Martin and Costa from applying the force they did. The officers

---

[113] *See, e.g.*, *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court.").

No. 19-30014

facing bystander liability claims are Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett.[114]

An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act.[115] Bystander liability requires more than mere presence in the vicinity of the violation; "we also consider whether an officer 'acquiesced in' the alleged constitutional violation."[116]

The district court denied qualified immunity to the "bystander officers," determining that the officers' only argument against bystander liability depended on whether Officers Martin and Costa committed an underlying constitutional violation.[117] The district court did not separately analyze the constitutional merits and the clearly established law. Before us, neither party engages in a separate analysis for each officer, as qualified immunity requires, and neither party briefed the clearly established law. As

---

[114] Again, we consider the actions of each officer individually. *Darden*, 880 F.3d at 731.

[115] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

[116] *Id*. at 647 (alteration omitted) (quoting *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

[117] The district court also stated that Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett were not entitled to summary judgment on the excessive-force claims, even though the court expressly analyzed excessive force only as to Officers Martin and Costa. We dispose of the claims against Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett using only the framework of bystander liability.

No. 19-30014

we did above, we will address the constitutional merits and then the clearly established law.[118]

We start by discarding non-starter arguments, one on each side. The officers again argue that the district court inappropriately relied on the complaint. Asked and answered. And Plaintiffs contend that the officers forfeited their argument that the record lacks evidence to support bystander liability. Plaintiffs note that the district court did not specifically address any no-evidence argument, but that does not conclusively show forfeiture. And at summary judgment, the officers argued that the "plaintiffs cannot prove any defendant failed to intervene because no defendant was aware that any other officer was violating JOSEPH'S constitutional rights." We needn't dwell on forfeiture further.

Next, the officers argue that they could not have known a constitutional violation was occurring because the district court could not definitively answer whether Officers Costa and Martin had in fact violated Joseph's constitutional rights. But the district court was not *incapable* of determining whether a constitutional violation occurred; at this stage in the

---

[118] Here, we part ways with the concurring opinion, which would avoid the constitutional merits on bystander liability because "it is plain that a constitutional right is not clearly established." *Post*, at 1 (quoting *Pearson*, 555 U.S. at 237). But usually, courts rely on *Pearson* when the lack of clearly established law is plain upon an examination of cases that arguably clearly establish the law. That is not our decision here—there is no clearly established law because Plaintiffs fail to identify any case, not because we reach any conclusion on any cases that could arguably clearly establish the law.

And there are cases in this circuit holding that officers who fail to intervene in the unconstitutional force of other officers can be liable in certain circumstances. *E.g.*, *Hale*, 45 F.3d at 919 (affirming denial of summary judgment because of a factual dispute over whether bystander officers should have intervened instead of laughing and yelling encouragements); *Carroll*, 800 F.3d at 178–79 (denying qualified immunity because of a factual dispute over whether the bystander officer was present while other officers continued to inflict force on a subject who was already subdued).

litigation, that was not the district court's job. Rather, the district court properly declined to resolve genuine, material factual disputes—that is the jury's job. When the jury has decided these factual disputes, then and only then can it be determined whether Officers Martin and Costa violated the Constitution.

The fact that there are competing narratives means only that, at this stage in the litigation, either narrative is possible. It does not mean that the officers saw nothing. If the jury agrees with Plaintiffs, then Officers Martin and Costa inflicted unconstitutional force, so Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett saw conduct that violated the Constitution. If the jury agrees with the officers, then Officers Martin and Costa did not inflict unconstitutional force, so Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett saw conduct that did not violate the Constitution.

Finally, the officers argue that there was no time or opportunity for them to intervene and that they could not perceive what Officers Martin and Costa were doing. But these arguments fall into the category of factual disputes that a jury must decide. The parties tell vastly different stories of what happened, and the video evidence exposes, rather than expunges, the disputed facts.

The video shows Officer Leduff positioned near Joseph's head for most of the encounter, at times holding Joseph down. It shows Officer Morvant observing the encounter from behind and in front of the counter, also holding Joseph down at times. It shows Officer Dugas observing from both sides of the counter and handing Officer Martin the baton. It shows Officer Varisco observing from both sides and on top of the counter, at one point offering his taser to Officer Martin. It shows Officers Thompson, Faison, Rolland, and Verrett observing the encounter from behind and in

No. 19-30014

front of the counter, assisting with holding Joseph down or dragging Joseph toward the more open area behind the counter. It shows Officer Bartlett observing from in front of the counter, then jumping over the counter to hold Joseph down.

As reflected in the following table, not every officer could have observed every infliction of force but, viewing the video in the light most favorable to Plaintiffs, every officer could have observed some of it:

| Force | Martin | Leduff | Morvant | Thompson | Dugas | Varisco | Costa | Rolland | Faison | Verrett | Bartlett |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tase 1 | MA | OHD | OHD | O | NP | NP | NP | NP | NP | NP | NP |
| Baton | MA | OHD | OHD | O | Supply baton | O | O | O | NP | NP | NP |
| Tase 2 | MA | OHD | O | OHD | OHD | Offer taser | OHD | O | O | OHD | O |
| Costa kicks | OHD | OHD | O | OHD | OHD | O | MA | O | O | O | O |
| Martin punches 1 | MA | O | O | OHD | OHD | O | OHD | O | OHD | OHD | O |
| Martin punches 2 | MA | O | O | OHD | OHD | O | OHD | O | OHD | OHD | O |
| Costa punches | OHD | O | O | OHD | OHD | O | MA | O | OHD | OHD | OHD |
| KEY: MA = main actor; O = observed; OHD = observed, held down; NP = not present | | | | | | | | | | | |

We may not disregard Plaintiffs' version of the facts unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it."[119] And there is no such contradiction here. The video evidence does not eliminate Plaintiffs' narrative that the officers knew excessive force was being applied, had the opportunity to try to stop it, and did not. If the jury found those facts to be true, then Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett: (1) knew Officers Martin and Costa were violating Joseph's constitutional rights, (2) were

---

[119] *Scott*, 550 U.S. at 380.

present at the scene of that constitutional violation, (3) had a reasonable opportunity to prevent the harm, but (4) chose not to act.[120]

Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett have raised no argument that defeats Plaintiffs' claim that they violated Joseph's Fourth Amendment rights by failing to intervene. They are not entitled to summary judgment on the constitutional merits.

2

But, again, that does not defeat qualified immunity. Plaintiffs have the burden to demonstrate that the law was "clearly established"—that, as of February 7, 2017, the date of their encounter with Joseph, any reasonable officer would have known that the Constitution required them to intervene.[121] And we cannot deny qualified immunity without identifying a case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment, and without explaining why the case clearly proscribed the conduct of that individual officer.

Plaintiffs do not identify a single case to support the argument that any reasonable officer would have known to intervene under these circumstances. We make no comment on whether Plaintiffs could have done so—the record in this case simply shows that they have not done so. In fact, they do not make any arguments as to the clearly established law. Nor do they argue that this case is obvious as to these nine officers. The officers don't identify cases or make arguments either, but that is not their burden.

---

[120] *Whitley*, 726 F.3d at 646.

[121] *Saucier*, 533 U.S. at 199.

As we noted, Plaintiffs made the same mistake for the clearly established law proscribing the conduct of Officers Martin and Costa. The district court pointed out this shortcoming and gave Plaintiffs a second chance in supplemental briefing. Plaintiffs did not fix it; the district court fixed it for them.

But the district court did not fix it here. The court did not assess the clearly established law applicable to the nine other officers. The Supreme Court strictly enforces the requirement to identify an analogous case and explain the analogy.[122] With no briefing and no district-court analysis to review, we cannot justify a denial of qualified immunity on the grounds that clearly established law shows that every officer acted unconstitutionally in this case. Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett are entitled to qualified immunity and summary judgment.

V

We are entitled to count on law enforcement to use no more force than necessary. And we are entitled to enforce that standard as a matter of constitutional law when officers fail to honor it.

The factual disputes that remain in this case are not just genuine, they are material, meaning that Plaintiffs are entitled to put their evidence against Officers Martin and Costa before a jury. Viewing the facts in Plaintiffs' favor, a reasonable jury could find that Joseph was not actively resisting arrest, and that Officers Martin and Costa immediately, repeatedly inflicted significant physical force. This permits a finding that Officers Martin and Costa failed

---

[122] *See Cole*, 935 F.3d at 473 (Ho & Oldham, JJ., dissenting) (noting thirteen cases in the last sixteen years in which the Supreme Court applied the "extraordinary remedy of a summary reversal" to correct failures to identify clearly established law with specificity).

to use measured and ascending force commensurate with Joseph's resistance, and therefore used excessive force in violation of the Fourth Amendment and in violation of the clearly established law.

And, while Plaintiffs meet half their burden to prove that genuine disputes of material fact exist as to whether Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett violated Joseph's constitutional rights, halfway is not good enough. Plaintiffs fail to meet their burden to show that Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett violated clearly established law.

We DISMISS the appeal to the extent it challenges the district court's factfinding. We AFFIRM the denial of summary judgment as to Officers Martin and Costa. We REVERSE the denial of summary judgment as to Officers Leduff, Morvant, Thompson, Dugas, Varisco, Rolland, Faison, Verrett, and Bartlett.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment.

I agree with the majority that police officers cannot beat an unresisting man. *See Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012). Under circuit precedent, that's enough to send Officer Costa and Officer Martin to trial.

I also agree with the majority that an absence of clearly established law entitles the "bystander officers" to qualified immunity. Where "it is plain that a constitutional right is not clearly established," the Supreme Court permits us not to reach the underlying constitutional merits. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). I would accept that invitation in this case. Doing so seems particularly wise here because the district court did not fully resolve the constitutionality of each bystander officer's conduct. And while I agree that "Plaintiffs fail to identify any case" to support their constitutional claims against the bystander officers, *ante* at 37 n.118, I think that militates in favor of avoiding those claims rather than adjudicating them. *See Pearson*, 555 U.S. at 239 (noting it makes sense to skip the constitutional merits where "the briefing of constitutional questions is woefully inadequate").