# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2022

Lyle W. Cayce
Clerk

No. 19-10013

---

Jacqueline Craig, *Individually and on behalf of minors* J.H., K.H., and A.C.; Brea Hymond,

*Plaintiffs—Appellees*,

*versus*

William D. Martin,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:17-CV-1020

---

ON PETITION FOR REHEARING EN BANC

Before Richman, *Chief Judge*, and Barksdale and Duncan, *Circuit Judges*.

Priscilla Richman, *Chief Judge*:

The petition for rehearing en banc has been denied. We withdraw the prior opinion that issued February 15, 2022, and substitute the following opinion.

This case concerns the denial of qualified immunity to a police officer. Jacqueline Craig and four of her children sued Officer William D. Martin,

No. 19-10013

asserting claims for unlawful arrest, bystander injury, and excessive use of force.[1]  The district court denied Martin's motion for summary judgment on the excessive force claims on qualified immunity grounds.[2]    This interlocutory appeal followed.[3]  We reverse the district court's denial of qualified immunity on the excessive force claims and render judgment in Martin's favor as to those claims.  We express no opinion regarding the district court's dismissal of the plaintiffs' other claims, which are not part of this appeal.

# I

On December 21, 2016, Officer Martin received a call dispatching him to a "disturbance" in the South Division of Fort Worth.[4]  The initial 9-1-1 call came from a middle-aged male, stating that several people were on his property arguing, had refused to leave, and were intentionally throwing trash in his yard.[5]  A subsequent 9-1-1 call came from the man's neighbor, Jacqueline Craig, complaining that the man had grabbed her son by the neck because the boy had allegedly littered.[6]

Martin responded to the call alone.[7]  He activated his body camera as soon as he arrived at the scene.[8]  One of Craig's daughters, Brea Hymond,

---

[1] ROA.10-11, 31.

[2] ROA.465-66.

[3] ROA.485-86.

[4] ROA.348.

[5] ROA.348, 361.

[6] ROA.15, 348, 361.

[7] ROA.348.

[8] ROA.349.

also recorded the event on her cell phone.[9] We detail the record evidence as to what transpired during Martin's encounter with Craig and her children in analyzing each of their respective claims.

As a result of the incident, Craig, individually and on behalf of her minor children J.H. and K.H., and Hymond (collectively plaintiffs) sued Martin for unlawful arrest and excessive use of force.[10] Craig also sued Martin on behalf of her minor child A.C., alleging injuries suffered as a bystander to the incident.[11] The district court dismissed A.C.'s claim as incognizable; it dismissed all of the remaining plaintiffs' claims for unlawful arrest, holding Martin was entitled to qualified immunity as to those claims.[12] Martin later moved for summary judgment on the remaining excessive force claims, but the district court denied Martin qualified immunity, concluding that the video evidence submitted by Martin was "too uncertain" to determine whether he was entitled to qualified immunity as to those claims.[13] Martin's interlocutory appeal accordingly concerns only the excessive force issue.

## II

"The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine 'to

---

[9] ROA.17, 349, 423.

[10] ROA.10-11.

[11] ROA.31.

[12] ROA.285, 292, 294.

[13] ROA.314, 465-66.

the extent that it turns on an issue of law.'"[14]  "[W]e can review the *materiality* of any factual disputes, but not their *genuineness*."[15]

"We review the materiality of fact issues *de novo*."[16]  When the district court does not specify what fact issues precluded a grant of summary judgment, as is the case here,[17] "[w]e can either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order."[18]  Given the limited record in this case and the availability of video evidence capturing the incident, we have reviewed the record rather than remanding, in order to "resolv[e] immunity questions at the earliest possible stage in litigation."[19]

Normally, "[t]he plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment."[20]  However, if there is video evidence that "blatantly contradict[s]" the plaintiffs' allegations, the court should not adopt the plaintiffs' version of the facts; instead, the court should view those facts "in the light depicted by the videotape."[21]  At oral argument, plaintiffs'

---

[14] *Flores v. City of Palacios*, 381 F.3d 391, 393 (5th Cir. 2004) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

[15] *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

[16] *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc).

[17] ROA.465-66.

[18] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 456 (5th Cir. 2001).

[19] *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam); *see also Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

[20] *Manis*, 585 F.3d at 843.

[21] *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *see also id.* at 378.

No. 19-10013

counsel acknowledged that the uses of force at issue are captured in the video evidence.[22]

Once a defendant properly pleads qualified immunity, the burden of proof shifts to the plaintiffs to negate the defense.[23] To meet this burden, the plaintiffs must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[24]

The plaintiffs allege that Martin's use of force violated their Fourth Amendment right to be free from excessive force during a seizure.[25] To prevail on a Fourth Amendment excessive force claim, a plaintiff must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[26] "Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'"[27]

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

---

[22] Oral Argument at 33:08-33:35.

[23] *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)).

[24] *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)).

[25] ROA.24, 26.

[26] *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)).

[27] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

No. 19-10013

20/20 vision of hindsight."[28]  "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'"[29]   "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[30] Viewing the evidence in the light most favorable to the plaintiffs, Martin's use of force against each plaintiff was not objectively unreasonable.

## A

We first consider Martin's use of force against Craig.  When Martin arrived at the scene, he spoke with the male complainant; Martin then approached Craig to obtain her version of the events.[31] Craig told Martin that the man had grabbed her son, A.C., after A.C. had allegedly littered.[32]  In response, Martin asked: "Why don't you teach your son not to litter?"[33] Craig, visibly agitated, told Martin that it did not matter whether her son had

---

[28] *Graham*, 490 U.S. at 396.

[29] *Deville*, 567 F.3d at 167 (quoting *Graham*, 490 U.S. at 396).

[30] *Graham*, 490 U.S. at 396-97.

[31] ROA.349; Martin Body Camera at 00:36-00:56.

[32] ROA.349, 421.

[33] ROA.421; Compilation Video at 00:51-00:53.

littered, asserting that the man did not have the right to put his hands on her son.[34] Martin replied: "Why not?"[35]

Craig started to shout at Martin after this provocation.[36] Martin asked why she was shouting at him, to which Craig responded: "Because you just pissed me off telling me what I teach my kids and what I don't."[37] Martin replied in a calm voice: "If you keep yelling at me, you're going to piss me off, and I'm going to take you to jail."[38] Immediately after this exchange, J.H., Craig's fifteen-year-old daughter, stepped between Craig and Martin and put her hands on Craig's forearms.[39] Martin grabbed J.H. and pulled her away from her mother.[40]

Moments later, K.H., Craig's fourteen-year-old daughter, began to walk around Martin's right side; K.H. then pushed Martin in the left side of his back, using most—if not all—of her body weight.[41] Martin pulled his taser and yelled, "Get on the ground!"[42] Martin then allegedly "shov[ed]" his taser into the middle of Craig's back.[43] Although Craig initially pled that Martin then "threw her to the ground,"[44] Craig's affidavit states that Martin

---

[34] ROA.350; Compilation Video at 00:56-01:00.

[35] ROA.350; Compilation Video at 01:00-01:02.

[36] Compilation Video at 01:05-01:12.

[37] Compilation Video at 01:22-01:27.

[38] Compilation Video at 01:27-01:30.

[39] ROA.350, 374, 443; Compilation Video at 01:32-01:33.

[40] Compilation Video at 01:32-01:37.

[41] Compilation Video at 01:37-01:41.

[42] ROA.353, 375; Compilation Video at 01:40-01:41.

[43] ROA.422; Compilation Video at 01:41-01:48.

[44] ROA.422.

"shov[ed]" her to the ground.[45]  Craig claims that, as she was going to the ground, her "left arm and shoulder blade [were] still suspended in [Martin's] grip—causing [her] severe pain."[46]  The video does not show any throwing or slamming motion; however, it does show Martin pushing Craig to the ground while maintaining a hold on Craig's left arm and releasing it as she slowly descends to the ground.[47]  Martin then handcuffed Craig.[48]

Under the circumstances, it was not objectively unreasonable for Martin to grab Craig and force her to the ground to effectuate her arrest. Martin was the only police officer at the scene, he had just been pushed from behind, and he was facing numerous people who were shouting and jostling as he attempted to separate Craig from the crowd and arrest her.

## B

After Martin handcuffed Craig, he walked over to J.H.[49]  As recounted above, before Martin arrested Craig, J.H. stepped between Craig and Martin and put her hands on Craig's forearms.[50]  Martin pulled J.H. away from her mother,[51] and after K.H. pushed Martin in the side, Martin ordered all of them to "get on the ground."[52]  After Martin arrested Craig, he again shouted, "Get on the ground."[53]  J.H., who was initially still standing,

---

[45] ROA.444.

[46] ROA.443-44.

[47] *See* Compilation Video at 01:41-01:49.

[48] ROA.353; Compilation Video at 01:58-02:06.

[49] ROA.353-55; Compilation Video at 02:04-02:07.

[50] ROA.350, 374, 443; Compilation Video at 01:32-01:33.

[51] Compilation Video at 01:32-01:37.

[52] ROA.353, 375; Compilation Video at 01:40-01:50.

[53] Compilation Video at 02:05-02:08.

squatted to the ground as Martin moved closer to her.[54]  Martin approached her, grabbed her left arm and the back of her neck, and placed her on the ground.[55]

Martin then walked Craig and J.H. to his vehicle.[56]  As Martin approached the rear passenger door of the vehicle, K.H. appeared from behind the back of the vehicle.[57]  She stood in front of the passenger door in an apparent attempt to block Martin from placing Craig and J.H. in the vehicle.[58]  Martin shouted: "Get back, or you're going to jail too," to which K.H. responded: "I don't care."[59]  Martin allegedly "struck" K.H. in the throat, moving her out of the way.[60]  Martin then attempted to get J.H. into the vehicle.[61]  J.H. resisted, leaving her left leg hanging out of the vehicle.[62]  Martin repeatedly told her to get in the police cruiser, but she refused.[63]  He then allegedly "kicked" J.H.'s left leg into the vehicle.[64]

The plaintiffs argue that Martin violated J.H.'s Fourth Amendment rights when he took her to the ground and when he allegedly kicked her leg

---

[54] ROA.355; Compilation Video at 02:04-02:07.

[55] Compilation Video at 02:06-02:11.

[56] ROA.355, 375-76; Compilation Video at 02:24-03:08.

[57] ROA.355-56, 376; Compilation Video at 03:06-03:08.

[58] ROA.355-56, 376; Compilation Video at 03:06-03:08.

[59] ROA.356, 376; Compilation Video at 03:09-03:11.

[60] ROA.356, 423; Compilation Video at 03:10-03:11.

[61] ROA.377; Compilation Video at 03:33-03:35.

[62] ROA.377; Compilation Video at 03:36-03:43.

[63] Compilation Video at 03:36-03:43.

[64] ROA.393, 423, 429, 446; Compilation Video at 03:42.

into the police vehicle.[65]   In both instances, J.H. was not complying with Martin's commands.  Physical force may be necessary to ensure compliance when a suspect "refus[es] to comply with instructions."[66]   However, "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'"[67]   A use of force is reasonable if an officer uses "'measured and ascending' actions that correspond[] to [a suspect's] escalating verbal and physical resistance."[68]

Martin's actions were sufficiently measured in relation to J.H.'s resistance.  Martin had commanded J.H. and others to get on the ground.[69] Although J.H. initially complied, she stood back up while Martin was handcuffing Craig.[70]  Martin approached J.H. and again ordered her to get on the ground, at which point J.H. squatted.[71]   Martin then took J.H. to the ground,[72] applying the necessary force to restrain and handcuff her.  With regard to the alleged "kicking," Martin had commanded J.H. to get into the police vehicle.[73]  J.H. continued to argue with Martin and kept her left leg outside of the vehicle.[74]   Martin used his foot to force J.H.'s leg into the vehicle because he was holding Craig with one arm and the door of the vehicle

---

[65] ROA.16-17, 20-21.

[66] *Deville*, 567 F.3d at 167.

[67] *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

[68] *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (unpublished) (per curiam)).

[69] ROA.353; Compilation Video at 01:40-01:50.

[70] Compilation Video at 01:49-02:07.

[71] Compilation Video at 02:04-02:07.

[72] Compilation Video at 02:06-02:11.

[73] Compilation Video at 03:40-03:42.

[74] Compilation Video at 03:40-03:45.

with the other.[75]   There is no indication that Martin's use of force was excessive.  The plaintiffs do not allege that J.H. suffered any injury as a result of the kick.[76]   Martin's use of force in response to J.H.'s resistance was not objectively unreasonable.

## C

We reach a similar conclusion with respect to K.H.  Fourteen-year-old K.H. had pushed Martin in his back using most—if not all—of her body weight before Martin arrested her mother, Craig.[77]   As stated above, after Martin had handcuffed and arrested Craig, and just as Martin was attempting to place Craig and J.H. into his police cruiser, K.H. appeared from behind the vehicle and placed herself immediately in front of Martin, preventing Martin from placing Craig and J.H. in the vehicle.[78]   Martin yelled, "Get back, or you're going to jail, too!"[79]   K.H. stood her ground, responding, "I don't care."[80]   After this response, Martin allegedly struck K.H. in the throat.[81] Martin's use of force moved K.H. out of his way, but otherwise had limited visible effect on her.[82]

On these facts, Martin's use of force was not objectively unreasonable. K.H.  had  assaulted  Martin—pushing  him  in  the  back—earlier  in  the

---

[75] *See* Compilation Video at 03:42.

[76] *See* ROA.130, 142 (noting that plaintiffs make no claim of any injury relating to Martin's use of force against J.H.).

[77] Compilation Video at 01:37-01:41.

[78] *See* Compilation Video at 03:07-03:11.

[79] ROA.356; Compilation Video at 03:09-03:11.

[80] ROA.356, 376; Compilation Video at 03:09-03:11.

[81] ROA.423; Compilation Video at 03:10-03:11.

[82] Compilation Video at 03:09-03:16.

No. 19-10013

altercation, and she was interfering with the lawful arrests of Craig and J.H. at the time Martin made physical contact with her. K.H. refused to move, and Martin used a relatively minimal amount of force to move her out of the way. Such conduct does not violate the Fourth Amendment.

## D

We come to Hymond's claim. Throughout Martin's encounters with and arrests of Craig and J.H., Hymond shouted at him while photographing what was transpiring from a close range.[83] After placing Craig and J.H. in the back of his police car, Martin turned to Hymond to arrest her for interfering.[84] He grabbed her by the wrist, put her up against the side of the police vehicle, and attempted to wrangle her cell phone out of her hands,[85] which he eventually did.[86] As he attempted to restrain her, Hymond tried to raise her hands and continued to scream at him.[87] He handcuffed her and then put her up against the vehicle a second time.[88] Although Hymond was in handcuffs, she continued to resist. Martin told Hymond that she was under arrest and asked if she understood, but she continued shouting without answering.[89] Hymond shouted for someone to "come here" and then "come around here."[90] There were other people on the scene, including at least one

---

[83] *See, e.g.*, Compilation Video at 02:50-03:00.

[84] ROA.358, 379; Compilation Video at 04:05-04:15.

[85] ROA.358, 379; Compilation Video at 04:15-04:28.

[86] *See*, Compilation Video at 04:30-04:47.

[87] Compilation Video at 04:28-04:46.

[88] ROA.358; Compilation Video at 04:43-05:30.

[89] Compilation Video at 05:05-05:10.

[90] ROA.358, Compilation Video at 05:08-05:16.

of Craig's family members who had not been arrested.[91]  Hymond was also twisting her body as she shouted, and she walked away from the squad car at one point.[92]  Martin moved her back.[93]  Hymond continued shouting and twisting.[94]  She turned her head halfway to her left in an attempt to look at Martin.[95]  Martin then began asking Hymond for her name and age.[96]  As Martin continued to ask, Hymond began twisting her body more aggressively, her body briefly moved up and down as if she were jumping, and she moved her head even more to her left to look squarely at Martin.[97]  All the while she continued to shout at Martin.[98]

Martin's sworn declaration filed in the district court states that after Hymond was handcuffed, she "continue[d] to yell and squirm," and Martin "beg[a]n to try to control her by applying leverage and slightly raising her arms, but the effort is in effective [sic]."[99]  The declaration says that Martin then "lift[ed] Brea Hymond's handcuffs slightly further.[100]  I never felt any particular resistance as she was clearly quite flexible, and I applied very little force when I raised her arms."[101]  His declaration continues, "If I had had to apply much force to raise her arms it would have forced her to bend forward

---

[91] *See* Compilation Video at 04:34-04:50 (depicting K.H. and others).

[92] ROA.358, 379; Compilation Video at 05:11-05:28.

[93] Compilation Video at 05:26-05:30.

[94] ROA.358-59; Compilation Video at 05:30-05:48.

[95] ROA.358; Compilation Video at 05:47-05:54.

[96] Compilation Video at 05:53-06:02.

[97] Compilation Video at 05:53-06:02.

[98] Compilation Video at 05:52-06:01.

[99] ROA.359.

[100] ROA.359.

[101] ROA.359.

at the waist, which never happened."[102]  Martin asserted in this declaration, "I was trying to use the technique to elicit some level of compliance from her . . . ."[103]

Hymond's briefing in district court in response to Martin's motion for summary judgment asserted that Martin "hyper-extended" her arms when she did not respond to questions about her name and age.[104]  Her briefing in our court did not make such an assertion until a motion for rehearing was filed after our initial opinion issued.[105]  Hymond's affidavit filed in the district court states that Martin "thrust" her arms up but does not attribute a motive or reason for his doing so.[106]

In Hymond's motion for a rehearing, she argues for the first time that Martin's use of force was excessive because he did it to force Hymond to answer his questions.[107]  The issue is whether, from an objective standpoint, Martin's use of force was reasonable given all of the facts and circumstances surrounding the arrest, not whether, subjectively, Martin raised Hymond's arms to obtain answers to his questions.[108]

---

[102] ROA.359.

[103] ROA.359.

[104] ROA.423.

[105] *Compare* Plaintiff's Br. at 1-22 (not making this allegation), *with* Pet. for Reh'g En Banc at 8 ("When [Hymond] failed to respond suitably, Martin hyper-extended her handcuffed arms by flexing them above her head in order to cause pain.").

[106] ROA.453.

[107] Pet. for Reh'g En Banc at 8.

[108] *See id.* at 628 (quoting *Graham*, 490 U.S. at 397) (explaining that "[c]rucially," the excessive force analysis "must be objective," requiring consideration of the officer's actions "without regard to their underlying intent or motivation.").

The video evidence shows that in the sixty seconds before Martin lifted up Hymond's arms, Hymond was resisting arrest: Hymond pulled and twisted her body back and forth while she was handcuffed;[109] repeatedly yelled for someone to "come around here" as several individuals who were not detained were nearby;[110] attempted to walk away from the police car;[111] shouted progressively louder as she twisted and turned more aggressively;[112] refused to answer Martin's questions about her name and age;[113] briefly jumped up and down;[114] and turned her head to the left to look directly at Martin.[115]  Martin stated in a sworn declaration that he took Hymond's request for others to "[c]ome around here" to mean that "she was maybe trying to call others to come assist her and to somehow interfere with [his] arrest of her."[116]  He also testified that he has "personally had more than one suspect attempt to escape while handcuffed, and [he] ha[s] had one female juvenile suspect head-butt [him] while in handcuffs."[117]

Taken in totality, Hymond's actions—twisting her body, walking away, screaming, jumping up and down, turning her head, and calling for others to "[c]ome around here"—reflect that Hymond was resisting arrest. The use of force was objectively reasonable as a means of restraining an

---

[109] Compilation Video at 05:06-05:09.

[110] Compilation Video at 05:08-05:16.

[111] Compilation Video at 05:11-05:26.

[112] Compilation Video at 05:30-05:54.

[113] Compilation Video at 05:53-06:02.

[114] Compilation Video at 05:58-06:02.

[115] Compilation Video at 06:01-06:02.

[116] ROA.358.

[117] ROA.358-59.

arrestee. The video evidence reflects that Martin lifted Hymond's arms for a total of eight seconds.[118] She did not bend at the waist.[119] Hymond claims this maneuver caused "[e]xcruciating pain"; however, the video shows that the maneuver had little to any effect on Hymond.[120] She repeated statements numerous times in a continuous stream as Martin raised her arms and immediately after he lowered them.[121] Neither her tone of voice nor her cadence changed.[122] Martin then placed Hymond into a second police vehicle that had just arrived at the scene.[123] Hymond's answers to written interrogatories state that she was "forced" into the police car,[124] which indicates that she resisted and did not willingly enter that vehicle.

The procedural posture of this case must be borne in mind. We are not reviewing a motion to dismiss, in which we would look only at the plaintiff's allegations. Martin filed a motion for summary judgment, and he supported that motion with video evidence and with his own declaration and that of his commanding officer. He stated in detail how Hymond responded to his efforts to arrest her,[125] and he and his commanding officer explained that, in their experiences as police officers, they had each been headbutted by a suspect while under arrest and handcuffed.[126] In Martin's case, he was

---

[118] Compilation Video at 06:02-06:10.

[119] Compilation Vide oat 06:02-06:10.

[120] ROA.453.

[121] Compilation Video at 06:03-06:15.

[122] Compilation Video at 06:03-06:15.

[123] ROA.359; Compilation Video at 06:14-06:27.

[124] ROA.384.

[125] ROA.358-59.

[126] ROA.359, 379.

headbutted by a juvenile who was handcuffed.[127]  In the face of this summary judgment evidence, it was then incumbent upon Hymond to produce *evidence*, not mere *allegations*, that raised a genuine dispute of *material* fact.[128]

Hymond failed to produce that evidence.  Her response to Martin's motion for summary judgment primarily quoted the allegations in her complaint,[129] but those unsworn allegations are not *evidence*.  They cannot defeat summary judgment in the face of sworn statements of fact that, if true, would entitle the movant to judgment.  The only relevant evidence that Hymond presented, other than the videos, regarding the specifics of her encounter with Martin, was her affidavit.  In the affidavit, she made the conclusory statements that "I was not resisting arrest or refusing to comply with any commands," "I was not confrontational and I fully complied with the commands of the [sic] Officer Martin," and "I was not actively resisting or noncompliant."[130]  Hymond did not deny that she pulled, twisted, turned, or walked—all of which is shown on the video while she is handcuffed.  She did not suggest that her movements on the video were attributable to Martin's conduct rather than her own in the face of Martin's declaration.  Stated another way, she did not controvert the specific facts set forth in Martin's declaration, which, if believed, would mean that Hymond was resisting arrest and that there was a legitimate concern that her movements could lead to an assault on the arresting officer.  Instead, she insisted that she was wrongfully arrested, and in her answers to written interrogatories, she

---

[127] ROA.359.

[128] *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also* Fed. R. Civ. P. 56(a).

[129] ROA.17, 423.

[130] ROA.453-54.

No. 19-10013

maintained that she was "forced" into a squad car.[131]  Asserting that she was "forced" into a squad car is directly contrary to her conclusory assertions that she complied with all requests Martin made of her and that she was not resisting arrest.

Nothing in our opinion should be construed as suggesting, much less holding, that officers may use pain maneuvers to force non-resisting individuals to respond to questioning.  We hold only that, consistent with our precedent, an officer may use reasonable force on someone "actively" resisting arrest.[132]  "The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive."[133]  Here, the video shows that Hymond actively resisted Martin's arrest, Martin waited more than a minute before using force,[134] and his force was relatively minimal with Hymond visibly experiencing little to any pain.[135]  Physical force may be necessary to ensure compliance when a

---

[131] ROA.384.

[132] *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 333 (5th Cir. 2020); *see also Graham*, 490 U.S. at 396.

[133] *Joseph*, 981 F.3d at 332.

[134] *Cf. Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (holding that the plaintiff alleged enough for an excessive force claim when "only three seconds elapsed" between the suspect's resistance and the officers' use of force); *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (same, with the use of force coming "immediately" after the suspect's resistance); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (per curiam) (same, with the force coming "quickly"); *see also* Compilation Video at 04:22-06:02.

[135] *Cf. Darden v. City of Fort Worth*, 880 F.3d 722, 726, 732-33 (5th Cir. 2018) (holding that the plaintiff alleged enough for an excessive force claim when officers killed a suspect after tasing him twice and putting him in a choke hold); *Newman*, 703 F.3d at 760, 763 (same, but with officers "str[iking] Newman a total of thirteen times in about nine seconds" with a nightstick and then tasing him three times); *Joseph*, 981 F.3d at 325, 327 (same, but with "Joseph endur[ing] twenty-six blunt-force injuries to his face, chest, back, extremities, scrotum, and testes" over an "eight-minute encounter"); *Deville*, 567 F.3d at 168 (same, but when the plaintiff suffered "contusions to both wrists, neuropathy of her

---

suspect "refus[es] to comply with instructions."[136] However, "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'"[137] A use of force is reasonable if an officer uses "'measured and ascending' actions that correspond[] to [a suspect's] escalating verbal and physical resistance."[138]

In sum, Martin's conduct in this case was not objectively unreasonable and did not violate Hymond's or any of the other plaintiffs' Fourth Amendment rights. On this basis alone, Martin is entitled to qualified immunity.

## III

Even assuming the plaintiffs could show that Martin committed a constitutional violation, Martin is nonetheless entitled to qualified immunity under the second prong of the qualified immunity analysis. Analysis of that prong requires that we determine whether Martin's uses of force "violated 'clearly established statutory or constitutional rights of which a reasonable [officer] would have known.'"[139] For a right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond

---

hands, [a] right shoulder strain, left shoulder bruising (with hand prints), and multiple cuts caused by broken glass" that required "four surgeries and multiple other injections."); *see also* Compilation Video at 06:03-06:15.

[136] *Deville*, 567 F.3d at 167.

[137] *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

[138] *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (unpublished) (per curiam)).

[139] *Bush v. Strain*, 513 F.3d 492, 500 (5th Cir. 2008) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)).

debate."[140]  "[N]o reasonable officer could believe the act was lawful."[141]
"That is because qualified immunity is inappropriate only where the officer
had 'fair notice'—'in light of the specific context of the case, not as a broad
general proposition'—that his *particular* conduct was unlawful."[142]  Thus,
"police officers are entitled to qualified immunity unless existing precedent
squarely governs the specific facts at issue."[143]  "[S]pecificity is especially
important in the Fourth Amendment context, where . . . it is sometimes
difficult for an officer to determine how the relevant legal doctrine, here
excessive force, will apply to the factual situation the officer confronts."[144]

The plaintiffs have failed to provide controlling precedent showing
that Martin's particular conduct violated a clearly established right.  They
also forfeited the argument that this case falls within the "obvious[ness]"
exception to providing controlling precedent, as they did not raise it in the
district court.[145]  Instead, they have pointed to several cases that discuss the

---

[140] *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

[141] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018); *see also Morrow
v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (explaining that "the law must be *so* clearly
established that—in the blink of an eye, in the middle of a high-speed chase—every
reasonable officer would know . . . immediately" that the conduct was unlawful).

[142] *Morrow*, 917 F.3d at 875 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)
(per curiam)).

[143] *Id.* at 876 (internal quotation marks omitted) (quoting *Kisela v. Hughes*, 138 S.
Ct. 1148, 1153 (2018) (per curiam)).

[144] *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (alterations in
original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)); *see also City of
Tahlequah v. Bond*, 142 S. Ct. 9, 11-12 (2021) (per curiam).

[145] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[I]n other instances a general
constitutional rule already identified in the decisional law may apply with obvious clarity to
the specific conduct in question, even though 'the very action in question has [not]
previously been held unlawful.'" (alteration in original) (quoting *Anderson v. Creighton*, 483

excessive force issue at a "high level of generality"—precisely what the Supreme Court has repeatedly advised courts they cannot do in analyzing qualified immunity claims.[146]

The first case the plaintiffs identify is *Sam v. Richard*.[147]  In *Sam*, the plaintiff presented evidence that he was on the ground with his hands behind his head when the officer slapped him across the face, kneed him in the hip, and then pushed him against a patrol car.[148]  The court concluded such a use of force on a compliant suspect was "excessive and unreasonable," noting that "it was clearly established at the time of the incident that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive."[149]

The second case the plaintiffs rely on to show that Martin's particular conduct violated clearly established law is *Darden v. City of Fort Worth*.[150]  In *Darden*, an officer threw a suspect to the ground after the suspect had placed his hands into the air in surrender.[151]  Officers tased the man multiple times.[152]  They choked him and repeatedly punched and kicked him in the

---

U.S. 635, 640 (1987))); *see also Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); ROA.431-33.

[146] *See, e.g.*, *Kisela*, 138 S. Ct. at 1152 (quoting *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015)).

[147] 887 F.3d 710 (5th Cir. 2018).

[148] *Id.* at 712, 714.

[149] *Id.* at 714 (citing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

[150] 880 F.3d 722 (5th Cir. 2018).

[151] *Id.* at 725.

[152] *Id.* at 725-26.

face.[153]  Not long after these actions, the man's body fell limp.[154]  He had suffered a heart attack and died.[155]  The court concluded that the officers' particular conduct violated a clearly established right.[156]  The court concluded that it was clearly established at the time of the incident that "a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest."[157]

The plaintiffs also cite *Joseph ex rel. Estate of Joseph v. Bartlett*.[158]  In *Joseph*, multiple police officers physically struck Joseph twenty-six times.[159] The officers also tased him twice.[160]  During the incident, Joseph was lying in the fetal position, was not actively resisting, and was continuously calling out for help.[161]  Joseph eventually became unresponsive and died in the hospital two days later.[162]  The court concluded that the officers used excessive force, and that their conduct violated a clearly established right.[163]  The court noted that "*Darden* repeated what had long been established in our circuit: Officers

---

[153] *Id.* at 726.

[154] *Id.*

[155] *Id.*

[156] *Id.* at 731-33.

[157] *Id.* at 732.

[158] 981 F.3d 319 (5th Cir. 2020).

[159] *Id.* at 327.

[160] *Id.* at 326-27.

[161] *Id.* at 336.

[162] *Id.* at 327.

[163] *Id.* at 342.

engage in excessive force when they physically strike a suspect who is not resisting arrest."[164]

None of these decisions, nor any of the other decisions identified by the plaintiffs,[165] provided Martin fair notice that his particular conduct was unlawful. To begin with, each of these decisions was issued *after* the events in question occurred on December 21, 2016. In any event, the decisions in *Sam*, *Darden*, and *Joseph* would not have provided fair notice because the plaintiffs in each case were not resisting arrest when the alleged unlawful conduct occurred.[166] In all three cases, the plaintiffs had either signaled their surrender by placing their hands in the air and ceasing further movements or were lying on the ground before the alleged unlawful conduct occurred.[167] In contrast, the plaintiffs in this case—except for Craig—were still resisting when the alleged unlawful conduct occurred.

Martin's use of force in this case is also far less severe than the use of force in any of the cases the plaintiffs have identified. For instance, the plaintiffs point to a case from this court in which the officer slammed a nonresistant suspect's face into a nearby vehicle, breaking two of her teeth.[168] They point to a decision from another circuit in which multiple officers punched, kneed, and kicked a suspect—while he was handcuffed on the ground—severely enough to fracture the suspect's neck.[169]

---

[164] *Id.*

[165] *See* Plaintiffs' Br. at 6 n.16.

[166] *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018); *Darden v. City of Fort Worth*, 880 F.3d 722, 732 (5th Cir. 2018); *Joseph*, 981 F.3d at 342.

[167] *Sam*, 887 F.3d at 714; *Darden*, 880 F.3d at 725-26; *Joseph*, 981 F.3d at 326.

[168] *Bush v. Strain*, 513 F.3d 492, 496 (5th Cir. 2008).

[169] *Krout v. Goemmer*, 583 F.3d 557, 561-63, 566 (8th Cir. 2009).

No. 19-10013

Although the plaintiffs need not point to a factually identical case to demonstrate that the law is clearly established, they nonetheless must provide some controlling precedent that "squarely governs the specific facts at issue."[170]  The plaintiffs have not provided such precedent here and thus have failed to show that the law clearly established that Martin's particular conduct was unlawful at the time of the incident.  Moreover, as we have noted before, the plaintiffs' reliance on the cases above "requires us to assume that Fifth Circuit precedent alone can clearly establish the law for qualified immunity purposes, something the Supreme Court has left open."[171]  Regardless, the plaintiffs have not overcome Martin's qualified immunity defense.

*    *    *

For these reasons, we REVERSE the district court's denial of qualified immunity on the excessive force claims and RENDER summary judgment in Martin's favor as to those claims.

---

[170] *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (internal quotation marks omitted) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)).

[171] *Ramirez v. Escajeda*, ___ F.4th ___, 2022 WL 3225405, at *4 (5th Cir. 2022) (citing *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) ("[A]ssuming that controlling Circuit precedent clearly establishes law for purposes of § 1983 . . . .")); *see also Betts v. Brennan*, 22 F.4th 577, 585 n.6 (5th Cir. 2022) (quoting *Rivas-Villegas*, 142 S. Ct. at 8) (assuming without deciding that circuit precedent can clearly establish the law).