# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 19, 2024

Lyle W. Cayce
Clerk

_____

No. 23-30510

_____

Quentin Terrell,

*Plaintiff—Appellant*,

*versus*

Town of Woodworth; Berkshire Hathaway Guard Insurance Companies; David Butler, *in his official capacity*; James Gonzales, *Individually and in his official capacity*; Lory Malone, *Individually*,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:21-CV-4224

_____

Before Stewart, Clement, and Ho, *Circuit Judges*.

Per Curiam:[*]

Quentin Terrell filed this suit pursuant to 42 U.S.C. § 1983 against the Town of Woodworth ("the Town"), its insurer, its mayor, and two police officers, alleging violations of his Fourth and Fourteenth Amendment rights, *Monell* and failure to train claims, and various state law tort claims. The

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30510

district court dismissed Terrell's federal law claims and declined to exercise supplemental jurisdiction over his remaining state law claims. For the reasons that follow, we AFFIRM.

## I. Factual & Procedural Background

On December 13, 2020, around 7:00 a.m., Terrell was driving a Pontiac Grand Prix in Woodworth, Louisiana when he was pulled over by Chief of Police James Gonzales. During the stop, Gonzales's body camera ("body cam") and dashboard camera ("dash cam") are both activated and record the following events as they transpire.[1] After Terrell pulls over, Gonzales approaches the driver's side of the vehicle and asks Terrell to "pull over a little bit more" because he is stopped partially in the roadway. Terrell complies and then Gonzales requests to see his driver's license and other paperwork. Gonzales then tells Terrell that he stopped him for speeding as he was going 47 mph in a 35 mph zone, and also because he was "swerving

_____

[1] Currently pending before this court is Terrell's motion to admit into the record on appeal the video evidence that was entered into the district court record, as well as other evidence that was not contained in the district court record. The defendants join Terrell's motion to the extent that he requests for the video evidence that was entered into the district court record to be entered into this court's record on appeal. The defendants oppose Terrell's motion, however, to the extent he requests other evidence besides the video footage to be entered into the record on appeal because that evidence was not before the district court. For purposes of this appeal, we agree that the video evidence that was entered into the district court record is necessary to our review as it was consistently relied on and referenced by the district court and both parties in the proceedings below. Accordingly, we GRANT in part Terrell's motion to the extent it seeks to admit the video evidence that was before the district court into the record on appeal, *i.e.*, the video footage from both officers' body cams and the video footage from Gonzales's dash cam. However, we DENY in part Terrell's motion to the extent he seeks to enter additional evidence into the record on appeal that was not contained in the district court record. *See IAS Servs. Grp., LLC v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 646–47 (5th Cir. 2018) (noting that in reviewing a district court's dismissal for failure to state a claim, our "review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint").

all over the road." As Gonzales is speaking with Terrell, he requests backup. Shortly thereafter, Officer Lory Malone arrives on the scene. Gonzales then asks Terrell to exit the vehicle and Terrell complies. Gonzales tells Malone to "watch" Terrell as he runs his paperwork, explaining that he had caught him going 48 mph in a 35 mph zone, that he was swerving all over the road, and that when he pulled him over, Terrell only partially pulled over, so that he continued to block the roadway, so Gonzales had him pull over further. Malone then states that he needs to go get his camera because it is charging, returning shortly thereafter with an activated body cam.

Gonzales begins to run Terrell's license in the computer database in his patrol car and walks back over to Terrell while the report is running. Gonzales then reminds Terrell that he was speeding and "swerving all over the road" when Gonzales had pulled him over. Gonzales then states that he smells what he believes to be marijuana coming from the vehicle and asks if Terrell will consent to a search of the vehicle. Terrell declines to give consent, stating that the car does not belong to him,[2] he does not smoke marijuana, and there is no marijuana or contraband in the vehicle.

Gonzales and Malone then both return to Gonzales's patrol car and Gonzales states that the report shows that Terrell had been arrested two months prior "for marijuana." Malone then confirms that he also smells marijuana coming from Terrell's vehicle and Gonzales states that he had observed a can of "Blunteffects," a canned spray that neutralizes odors, in the passenger seat of the vehicle. Gonzales then walks back over to Terrell and informs him that he is going to conduct a "probable cause" search based on the odor of marijuana coming from Terrell's vehicle. Terrell asks

_____

[2] According to subsequent conversation between Gonzales and Terrell, the car that Terrell was driving belonged to his girlfriend or a female friend.

Gonzales to just give him a ticket and let him go home. Against Terrell's protests, Gonzales tells Malone to stay with Terrell while he conducts a search of the vehicle, further informing Terrell that Malone would be conducting a search of his person. Malone thoroughly searches Terrell's person and when he is finished,[3] asks Terrell to take a seat on the "push bar" of his patrol car. Terrell declines to do so, however, continuously asking if the officers are really going to search the vehicle. Terrell then begins to advance toward the vehicle as Gonzales is searching it, so Malone instructs him to turn around and place his hands behind his back, reaching toward Terrell's hand, presumably to handcuff him.

The following events then take place over a timespan of approximately twenty seconds and are best captured on Gonzales's body cam, and to some extent his dash cam footage. Although the incident is also captured on Malone's body cam, his body cam falls off within approximately eight seconds and only audio is captured thereafter. Terrell suddenly breaks free from Malone and runs over to the front passenger side door as Gonzales is searching the vehicle, retrieves a handgun, and begins running away from the officers, towards the woods, with the gun in his hand. Malone begins to chase Terrell, and his body cam falls off. Malone catches up with Terrell and tackles him, and both men fall to the ground. After the two men fall to the ground, Terrell starts to get up, and Malone yells to Gonzales, "He's got a gun!" As Terrell tries to continue towards the woods, the officers yell at Terrell to "drop the gun, drop it!" Malone then fires two non-fatal shots into Terrell's back, and Terrell falls to the ground bleeding and cursing. Gonzales's body cam captures Terrell being shot, but not Malone firing the shots, although it is undisputed that Malone fired the shots. Both officers then approach and

---

[3] The record does not indicate that Malone discovered any contraband or weapons on Terrell's person.

begin to administer first aid to Terrell while calling for additional medical personnel and law enforcement backup. A few minutes after medical personnel arrive and take over the care of Terrell, his handgun is discovered in the grass near the area where he was tackled. According to Terrell's Amended Complaint, he dropped the handgun when Malone first tackled him, before he got up again and continued to advance towards the woods; so when Malone shot him, he was unarmed.

Terrell was charged with speeding, improper lane usage, littering, unauthorized use of a motor vehicle, being a felon in possession of a firearm, resisting a police officer with force or violence, aggravated assault upon a police officer with a firearm, flight from an officer, and battery on a police officer. According to Terrell, a subsequent search of his vehicle revealed no evidence of marijuana. He further contends that the Rapides Parish District Attorney reviewed his case and declined to prosecute him on any of the charges for which he was arrested.

In December 2021, Terrell filed a civil rights complaint under 42 U.S.C. § 1983 against the Town and its insurer, Berkshire Hathaway Guard Insurance Companies ("Berkshire"), the Mayor of Woodworth, David C. Butler, in his official capacity, Gonzales in his individual and official capacities, and Malone in his individual capacity, alleging violations of his Fourth and Fourteenth Amendments rights, *Monell*[4] and failure to train claims, and state law tort claims. Terrell then amended his complaint and moved for voluntary dismissal of certain claims and defendants, so that the only remaining defendants were the Town, Berkshire, and Malone and Gonzales in their individual capacities only (collectively, "Defendants").

His federal claims under § 1983 alleged unreasonable warrantless

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

search and seizure without probable cause against Gonzales; use of excessive force in violation of his Fourth Amendment rights against Malone; failure to intervene in violation of his Fourteenth Amendment rights against Gonzales; and municipal liability against the Town under *Monell* and for failure to train. His supplemental state law tort claims alleged false arrest and imprisonment against all Defendants, battery against Malone and the Town, malicious prosecution against all Defendants, and defamation against Gonzales and the Town. Throughout his complaint, Terrell referenced the officers' video footage of the incident and also included still shots taken from the video footage within the body of his complaint. As a remedy, Terrell sought compensatory and punitive damages, attorney's fees, interest, and costs.

Defendants moved to dismiss Terrell's federal and state law claims under Federal Rule of Procedure 12(b)(6) on grounds that he failed to state a claim for relief. Defendants also sought, over Terrell's opposition, to admit the video footage taken from both officers' body cams and Gonzales's dash cam, as records kept in the ordinary course of business. The magistrate judge ("MJ") issued a report and recommendation ("R&R") determining that the video footage should be admitted into the record as public records. The MJ further noted that Terrell had incorporated and referenced the video footage in his amended complaint, making the footage central to his claims. The MJ then recommended that Defendants' motion to dismiss be granted. Upon conducting a de novo review, the district court adopted the MJ's R&R for the reasons stated therein and dismissed Terrell's federal claims under § 1983 with prejudice. It then declined to exercise supplemental jurisdiction over Terrell's remaining state law claims under 28 U.S.C. § 1367(a), dismissing those claims without prejudice.

As to Terrell's excessive force claim against Malone, the district court reasoned that under "the tense and quickly evolving factual circumstances, Officer Malone could have reasonably believed that Terrell posed a threat of

serious harm." It further opined that the body cam evidence indicated that Malone's use of force was objectively reasonable, and Terrell failed to present evidence establishing otherwise. Thus, Malone was entitled to qualified immunity on this claim.

The district court then explained that Terrell's claim against Gonzales for unreasonable search and seizure also failed because Gonzales's "seizure of Terrell was not unconstitutional as he had probable cause for the traffic stop and investigatory detention," given that Terrell had been speeding and the officers detected the odor of marijuana after they pulled him over. It concluded that Gonzales was also entitled to qualified immunity on this claim.

Regarding Terrell's failure to intervene claim against Gonzales, the district court concluded that Terrell could not plausibly show that Gonzales knew that Malone was going to use deadly force, or that he had a reasonable opportunity to act to intervene in Malone's use of that force, so there was no constitutional violation.

As to Terrell's *Monell* and failure to train claims against the Town, the district court concluded that he failed to allege a viable underlying constitutional violation so his claims could not survive and were dismissed. Thereafter, the district court concluded that because all of Terrell's federal law claims under § 1983 had been dismissed, his state law claims were also dismissed without prejudice, so that he could file those claims in the appropriate state court. Terrell filed this appeal.

## II. Standard of Review

"We review the grant of a motion to dismiss under Rule 12(b)(6) de novo, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs.'" *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333,

338 (5th Cir. 2008)). We also review the grant of a motion to dismiss based on qualified immunity de novo. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 684 (5th Cir. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading is insufficient if it contains only conclusory allegations, naked assertions, and formulaic recitations of the elements of a cause of action. *Id.*

## III. Discussion

On appeal, Terrell alleges that the district court erred in: (1) applying *Scott v. Harris*[5] when the video evidence was susceptible of differing interpretations and did not blatantly contradict Terrell's claims that Malone used excessive force; (2) granting Defendants' motion to dismiss when Malone did not give a deadly force warning before shooting Terrell; (3) making an improper credibility determination in deciding Terrell's unreasonable search and seizure claims; (4) dismissing Terrell's *Monell* and failure to train claims against the Town; and (5) dismissing Terrell's state law claims.[6] We address each of his arguments in turn.

### A. Excessive Force

"To state a claim under 42 U.S.C. § 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law." *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 413 (5th Cir. 2021). "The doctrine of qualified immunity protects government officials from civil damages

---

[5] 550 U.S. 372 (2007).

[6] Terrell does not appeal the district court's dismissal of his Fourteenth Amendment claim against Gonzales for failure to intervene.

liability when their actions could reasonably have been believed to be legal." *Id*. (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). When the defense of qualified immunity has been asserted, the burden is on the plaintiff to demonstrate that "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time." *Id*. (quoting *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019)).

"To overcome the officers' claim of qualified immunity on [a plaintiff's] claim of excessive force, [the plaintiff] must show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (internal quotation marks and citation omitted); *see also Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (explaining that to establish that an officer used excessive force, a plaintiff must show that he "suffer[ed] an injury that result[ed] directly and only from a clearly excessive and objectively unreasonable use of force"). "Excessive force claims are thus necessarily fact-intensive and depend on the facts and circumstances of each particular case." *Poole*, 691 F.3d at 628 (internal quotation marks, alterations, and citations omitted). Factors guiding our inquiry into the objective reasonableness of the use of force include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Bartlett*, 981 F.3d at 332 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). These considerations are to be reviewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

*(1) Consideration of Video Evidence under <u>Scott v. Harris</u>*

As a preliminary matter, we agree that the district court properly considered the video evidence from the officers' two body cams and Gonzales's dash cam that Defendants attached to their motion to dismiss because Terrell consistently referenced the video evidence in his complaint, providing still shots from the videos, and the video evidence is clearly central to his claims against Defendants in this suit. *See Dorsey*, 540 F.3d at 338 ("A court is permitted, however, to rely on documents incorporated into the complaint by reference . . . ." (internal quotations marks and citation omitted)); *see also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.").

Turning to the merits of Terrell's first excessive force argument, he argues that the video evidence in his case is unreliable because Malone's bodycam fell off when he tackled Terrell and the actual shooting which occurred just seconds later took place out of frame. Citing this court's holding in *Crane v. City of Arlington*, 50 F.4th 453, 462 (5th Cir. 2022), he contends that the video evidence in his case is ambiguous at best and thus the district court erred in applying the modified rule from *Scott v. Harris*, 550 U.S. 372 (2007). Terrell asserts that if the district court had not erroneously credited the ambiguous video evidence in his case, it would have held that Terrell pleaded sufficient facts to plausibly allege that Malone's decision to shoot him was an excessive use of force. But Terrell misconstrues our precedent.

In *Scott*, the Supreme Court reasoned that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380. There, the Court admonished the court of

appeals for relying on the respondent's version of events rather than "view[ing] the facts in the light depicted by the videotape." *Id*. at 380–81. Fifteen years later in *Crane*, this court again acknowledged that "[w]hen there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video." 50 F.4th at 461–62. We observed there that "when video evidence is ambiguous or incomplete, the modified rule from *Scott v. Harris* has no application." *Id*. at 462. Significantly, however, we clarified that "a court should not discount the nonmoving party's story *unless the video evidence provides so much clarity that a reasonable jury could not believe his account*." *Id*. (emphasis added).

Here, the video evidence does just that. As an initial matter, Terrell has never disputed that he broke free from Malone and ran to the passenger side of the vehicle to retrieve a gun. Nor does Terrell dispute that, as he was running towards the woods armed with his handgun, Malone tackled him in attempt to prevent him from fleeing, while his gun was still in his hand, and the two men fell to the ground, as he continued to try to escape Malone's grasp. The only point that Terrell meaningfully disputes is whether Malone realized that Terrell dropped his gun during the tackle so that when Terrell broke free from Malone for the second time and again attempted to flee, he was suddenly unarmed. According to Terrell, because Malone's body cam fell off at this point, and he shot Terrell seconds later without the moment of the shooting being recorded, the video footage is ambiguous and unreliable for purposes of determining whether Malone used excessive force on grounds that he knew Terrell was unarmed. We disagree.

Although Terrell is correct that the shooting took place out of frame, he is incorrect that the video evidence is ambiguous. As the district court observed:

Contrary to Terrell's conclusory assertions, the body cam does not establish that it was apparent to Officer Malone that Terrell lost control of the gun or that it fell to the ground. Although still shots included in the Complaint show the gun on the ground, review of the body cam depicts Officer Malone shouting, "Drop the gun, drop the gun." And it does not show the gun on the ground until over five minutes after the shooting. Clearly, the video evidence shows this was a "tense, uncertain, and rapidly evolving" situation in which the suspect posed an "immediate threat to the safety of the officers or others," and in which the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The body cam clearly shows Officer Malone had the reasonable belief that Terrell was still armed as he yelled for him to "drop the gun." *See Scott*, 550 U.S. at 380.

Given that the video evidence does not support Terrell's claims that Malone knew he was unarmed as he broke free a second time and attempted once again to flee, the only remaining question is whether Malone's actions constituted "a clearly excessive and objectively unreasonable use of force" when the shooting occurred. *Bartlett*, 981 F.3d at 332. Our review of the evidence indicates that the answer is no. Again, the video footage reveals that Terrell undoubtedly posed an immediate threat to officers and others, depicting Terrell aggressively resisting arrest as he physically engaged with Malone, breaking free from Malone not once, but twice. He broke free from Malone the first time to get his weapon and attempt to flee, and he broke free a second time from Malone after he was tackled, advancing towards the woods. The video footage supports that Malone did not know that Terrell was no longer armed since he shouted for Terrell to drop the gun.

As we have held in other cases with similar factual scenarios, "[t]he question is whether the officer's belief that he saw a gun was sufficiently

reasonable to justify the use of deadly force in light of all the surrounding circumstances." *See Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023). Here, it was. From Malone's perspective, there was no evidence that Terrell was suddenly unarmed as only seconds had passed since Malone had tackled him with a gun in his hand. *See id.* ("[I]f the officer believes the suspect has a gun, the calculation changes—even if there was never, in fact, a gun."). Moreover, now that Terrell had broken free a second time and was once again attempting to flee, Malone could have reasonably believed that Terrell, who he thought was still armed, could turn around at any moment and point his gun back on Malone or Gonzales. As we have recently observed, "officers need not wait until a fleeing suspect turns his weapon toward bystanders before using deadly force to protect them." *Wilson v. City of Bastrop*, 26 F.4th 709, 714 (5th Cir. 2022).

Accordingly, because the situation was "tense, uncertain, and rapidly evolving," and Malone had the reasonable belief that Terrell was still armed as he continuously resisted arrest and attempted to flee, we agree with the district court that Malone's use of force in this case was "objectively reasonable" and not "clearly excessive." *See Poole*, 691 F.3d at 629; *see also Valderas v. City of Lubbock*, 937 F.3d 384, 390 (5th Cir. 2019) ("An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm."); *Bartlett*, 981 F.3d at 332 (noting that factors guiding our inquiry into the objective reasonableness of an officer's use of force include whether the suspect posed an immediate threat to the safety of the officers and whether the suspect was actively resisting arrest or attempting to evade arrest by flight); *Graham*, 490 U.S. at 396 (observing that in determining whether the use of force was objectively reasonable, the facts should be reviewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). In light of this analysis, we hold

that the district court did not err in discrediting Terrell's version of events as contradicted by the video evidence. *See Scott*, 550 U.S. at 380.

### (2) Failure to Give Deadly Force Warning

Terrell's second excessive force argument is that the district court erred in granting Defendants' motion to dismiss when Malone failed to give Terrell adequate warning before using deadly force. According to Terrell, the officers could not have believed that he posed an immediate threat justifying the use of deadly force without warning because Malone attempted to tackle him and he was attempting to flee, unarmed. Again, we are unpersuaded by his arguments.

The Supreme Court has stated that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Likewise, this court has acknowledged, that "[e]ven when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." *Allen*, 65 F.4th at 744 (quoting *Poole*, 13 F.4th at 425). "And the use of force should be proportional to the threat." *Id*. (citation omitted). "Thus, if the officer could reasonably use less than deadly force, he must." *Id*. at 745. We have further reasoned that "[t]he use of deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Valderas*, 937 F.3d at 389 (citations omitted). "Stated differently, [a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm." *Id*. (internal quotation marks and citations omitted).

As discussed above, the video evidence supports that Malone attempted to use less than deadly force against Terrell twice before resorting

to deadly force. The first time, Malone was preparing to place handcuffs on Terrell in a controlled manner, yet Terrell responded by breaking free from Malone's grasp and running to retrieve a weapon from his vehicle as Gonzales was searching it. Despite Terrell's alarming act of breaking free and grabbing a gun, Malone again attempted to use less than deadly force a second time by tackling Terrell as he attempted to flee. Yet Terrell once again continued to aggressively resist arrest, breaking free from Malone again and attempting to advance towards the woods.

The video evidence further supports that Malone had the reasonable belief that Terrell was in fact still armed as he attempted to flee this second time because as Terrell was attempting to flee, only seconds had passed since Malone had tackled him and Terrell was still holding a gun in his hand. Malone's reasonable belief is further supported by the fact that he yelled for Terrell to drop the gun. Moreover, Terrell consistently demonstrated throughout the entire incident that he had zero regard for either of the officers' warnings, attempting to argue with them as they began conducting the search of his car, and refusing to put his hands behind his back to be handcuffed. Indeed, even at the point Terrell alleges he dropped the gun, he *still* ignored Malone's attempts to stop him, rolling away from Malone's grasp and continuing to advance towards the woods.

In short, the record indicates that Terrell failed altogether to comply with a single command of either officer once he initially broke free from Malone, and the video evidence further confirms that Malone had the reasonable belief that Terrell was still armed the second time he broke free, posing a serious and immediate threat to the safety of both officers. *Valderas*, 937 F.3d at 389. Although Terrell is correct that an officer should give a warning before using deadly force, even to a suspect he believes is armed, he must only do so *when feasible. See Allen*, 65 F.4th at 744. Here, Terrell's consistent refusal to comply with both officers' commands, his successful

attempt at arming himself, and his aggressive attempts to resist arrest and ongoing continuous attempts to flee the scene throughout the entire encounter, make it clear that it was not feasible under these circumstances for Malone to warn Terrell, any more than he had already attempted to, before using deadly force. Moreover, Malone made multiple attempts to use non-deadly force with Terrell, only resorting to deadly force when his initial attempts were unsuccessful. *See also Solis v. Serrett*, 31 F.4th 975, 983 (5th Cir. 2022) ("[An] officer must use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance.") (internal quotation marks and citation omitted).

Accordingly, we hold that the district court did not err in determining that Malone's use of force was objectively reasonable and not a violation of Terrell's constitutional rights, thus entitling him to qualified immunity on Terrell's Fourth Amendment excessive force claims.

### B. Search & Seizure Credibility Determination

Terrell next argues that the district court erred in making an improper credibility determination in deciding Terrell's unreasonable search and seizure claims. According to Terrell, the district court erred in determining that Gonzales was credible based on his self-serving statement that Terrell was speeding, when he stated two different speeds during the traffic stop, *i.e.*, 47 mph and 48 mph. Terrell further contends that Gonzales never had probable cause to initiate the traffic stop based on speeding especially because Terrell stated that he was not speeding. He further takes issue with Gonzales's decision to search the vehicle based on his statement that he smelled the odor of marijuana coming from the car, since there was no marijuana ever found in the vehicle. Terrell's arguments are meritless.

Unreasonable searches and seizures are prohibited by the Fourth Amendment. U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1 (1968). As

with excessive force, once the defendant asserts qualified immunity against a claim of unreasonable search and seizure, the plaintiff must show that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the alleged violation. *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted).

"A *Terry* stop is a special category of Fourth Amendment seizures, in which an officer may briefly detain an individual for further investigation, if the officer has reasonable suspicion the individual is engaged in criminal activity." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (citations and internal quotation marks omitted). This court "analyze[s] the constitutionality of a traffic stop using the two-step inquiry set forth in *Terry v. Ohio*." *United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017) (citation omitted). At step one, "we determine whether the stop was justified at its inception." *Id.* (citation omitted). "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* (citation omitted). "The Fourth Amendment permits law enforcement officers who have lawfully detained a motor vehicle to order the driver and any passengers to step out, and neither probable cause nor reasonable suspicion is required." *United States v. Meredith*, 480 F.3d 366, 371 (5th Cir. 2007).

Upon determining that the stop was justified, we move on to step two where we analyze "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Bams*, 858 F.3d at 942 (citation omitted). "A traffic stop must be temporary and last no longer than is necessary to effectuate the

purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* (citation omitted). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).

Here, the record confirms that under step one of the *Terry* inquiry, Gonzales's initial stop of Terrell was justified at its inception because the stop was based on Gonzales's belief that Terrell had committed a traffic violation, *i.e.*, speeding. *See Bams*, 858 F.3d at 942 (stating that a stop is justified at its inception when it is based on the officer's belief that a traffic violation has been committed). Gonzales stated to both Terrell and Malone that he had captured Terrell's speed at a rate of 47 or 48 mph in a 35 mph zone. Although Terrell takes issue with the fact that Gonzales allegedly told him he was traveling at a rate of 47 mph yet later claimed he was traveling at a speed of 48 mph, that discrepancy does not negate the fact that Terrell was committing a traffic violation at either speed since he was traveling in a 35 mph zone. As Defendants point out, contrary to his arguments on appeal, Terrell never disputed before the district court that he was speeding when Gonzales pulled him over; he only complained that the Town was known for its speed traps. Indeed, as Terrell stated in his Amended Complaint, he "pleaded with Chief Gonzales to just write him a ticket for speeding and/or reckless operation and follow him home." Consequently, we agree with the district court that Gonzales's initial stop of Terrell was justified. Likewise, we agree that our established precedent recognizes that the Fourth Amendment permitted Gonzales to order Terrell out of the car once he made the initial justified traffic stop. *Meredith*, 480 F.3d at 371 (explaining that an officer who has lawfully detained a motor vehicle may order the driver to step out of the car).

Turning to step two of the *Terry* inquiry, we now must determine whether the stop lasted no longer than necessary to effectuate its purpose, "unless further reasonable suspicion, supported by articulable facts, emerge[d]." *Bams*, 858 F.3d at 942 (citation omitted). Here, the record confirms that although the stop was extended past Gonzales's original purpose of stopping Terrell for a traffic violation, the extension was justified because "further reasonable suspicion" of additional criminal activity emerged that was "supported by articulable facts." *See id.* As the video evidence shows, both Gonzales and Malone stated that they smelled the odor of marijuana coming from Terrell's vehicle after his initial stop for the traffic violation. When Gonzales ran Terrell's license, the report showed that he had been arrested for a marijuana-related offense two months prior. Malone observed that a can of "Blunteffects," a spray that neutralizes odors, was in the passenger seat of the vehicle.

Although the officers sought Terrell's consent to search the vehicle, he refused. Thus, they conducted a probable cause search based on the smell of the marijuana coming from the vehicle. And as this court's well-established precedent provides, an officer's detection of the odor of marijuana coming from a vehicle is sufficient to support probable cause to search the vehicle, regardless of whether marijuana is ever found. *See United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) ("[T]he smell of marihuana alone may be ground enough for a finding of probable cause, as this Court has held many times."); *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (observing that "the detection of the odor of marihuana justified a search of the entire vehicle" and that it was "not controlling . . . that no marihuana was ever found"); *United States v. Henke*, 775 F.2d 641, 645 (5th Cir. 1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."). Consequently, the record fails to support Terrell's argument that the district court engaged in improper credibility

determinations by crediting the officers' statements that Terrell was speeding and that they detected the odor of marijuana coming from inside the vehicle he was driving.

Accordingly, we hold that the district court did not err in determining that the stop and subsequent search of Terrell's vehicle were not violative of his Fourth Amendment rights against unreasonable search and seizure. *See Bams*, 858 F.3d at 942. We also agree with its determination that the officers are entitled to qualified immunity as no violation of Terrell's constitutional rights occurred. *See King*, 821 F.3d at 653.

### C. Dismissal of <u>Monell</u> & Failure to Train Claims

Next, Terrell alleges that the district court erred in dismissing his *Monell* and failure to train claims against the Town. According to Terrell, his claims should not have been dismissed because "he has alleged a viable constitutional violation for illegal search and seizure." Because we have already rejected Terrell's Fourth Amendment claims, however, we must also reject his *Monell* and failure to train claims.

"It is well established that a city is not liable under § 1983 on the theory of respondeat superior." *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). For this reason, "[a] municipality is liable only for acts directly attributable to it through some official action or imprimatur." *Id.* (internal quotation marks and citation omitted). "Municipalities may be held liable under § 1983 for constitutional violations if: (1) there is a constitutional violation; (2) an official policy or custom; and (3) a showing that the official policy or custom was the operational force behind the constitutional violation." *Bellard v. Gautreaux*, 675 F.3d 454, 462 (5th Cir. 2012) (citing *Monell*, 436 U.S. at 694). Thus, without the showing of a constitutional violation, a *Monell* claim cannot survive. *Id.* Likewise, a failure to train claim cannot survive without the

showing of a constitutional violation. *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (concluding that the plaintiff's failure to train claim failed without an underlying constitutional violation); *see also Bustos v. Martini Club, Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.").

As we have concluded herein *supra*, Terrell has failed to adequately allege a constitutional violation for unreasonable search and seizure under the Fourth Amendment or otherwise. Accordingly, his *Monell* and failure to train claims against the Town cannot survive, and we hold that the district court did not err in dismissing them.

### D. Dismissal of State Law Claims

Finally, Terrell argues that the district court erred in dismissing his state law claims, because his federal law claims should not have been dismissed. Again, because we have already concluded that the district court properly dismissed all of Terrell's federal law claims against Defendants, we uphold its decision declining to exercise supplemental jurisdiction over Terrell's remaining state law claims under 28 U.S.C. § 1367(a). *See Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial . . . ."); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988) (explaining that when all federal law claims are "eliminated at an early stage of the litigation, the District Court ha[s] a powerful reason to choose not to continue to exercise jurisdiction.").

No. 23-30510

## IV. CONCLUSION

The district court's judgment dismissing Terrell's federal and state law claims against Defendants is AFFIRMED.